Exhibit 1



**THE HARTFORD**

## IMPORTANT NOTICE TO POLICYHOLDERS
## (CYBER RISK SUPPORT)

*To Report Time Sensitive Cyber Security Incidents*:

FirstResponse 24/7 Hotline:
800-370-0605

FirstResponse E mail:
FirstResponse@thehartford.com

Access to *The Hartford Cyber Center*

Thank you for choosing The Hartford to meet your cyber insurance needs. We recognize that that you are likely faced with complex challenges in a fast-evolving cyber landscape and – like many of your competitors – you're looking to protect assets and manage comprehensive information security and privacy programs.

In addition to your cyber insurance policy, The Hartford provides you with access to a proprietary web portal that can help manage cyber-related exposures. Through *The Hartford Cyber Center*, policyholders can have access to more details on our **Cyber Services Portfolio**, which includes:

- A panel of third party incident response service providers
- Third party cybersecurity service providers and a list of approved services
- Risk management tools, including self-assessments, best practice guides, templates, and sample incident response plans
- White papers, blogs and webinars from leading privacy and security practitioners
- Up-to-date cyber-related news and events, including examples of privacy and security related events

To access *The Hartford Cyber Center*:

1. Visit www.thehartford.com/cybercenter

2. Enter policyholder information

3. Access code: 952689

4. Login to The Hartford Cyber Center

Please be advised of the following:

- *The Hartford Cyber Center* is a proprietary web portal exclusively provided to our valued policyholders. Please do not share the access code with anyone outside of your organization.

- Registration is required to access the *The Hartford Cyber Center*. While the policyholder can register as many users as necessary, risk managers, general counsel, security or privacy leaders are appropriate candidates for registration.

- *The Hartford Cyber Center* enables you to access third party service provider references and materials for educational purposes only. The Hartford does not specifically endorse any such service provider within *The Hartford Cyber Center* and hereby disclaims all liability with respect to use of, or reliance on, such service providers. All service providers are independent contractors and not agents or affiliates of The Hartford. The Hartford does not warrant the performance of the service providers. We strongly encourage all policyholders to conduct their own assessments of the service providers' services and the fitness or adequacy of such services for the particular policyholder's needs.

- Contacting a service provider about any issue does not constitute providing The Hartford with notice under your policy. Proper notice is just one important requirement of coverage.

- Please read your policy. All questions concerning the coverage terms, conditions and exclusions of your policy, including any policyholder obligations related thereto, should be addressed to your agent or broker.

- This Notice does not amend or otherwise affect the provisions of any insurance policy.

# Fail**Safe**®

## G I G A

### enterprise l i a b i l i t y

# Declarations Page

<u>HARTFORD FIRE INSURANCE CO.,</u>
<u>HARTFORD PLAZA, HARTFORD, CT 06115</u>
A stock insurance company, herein called the Insurer

**THIS POLICY CONTAINS CLAIMS MADE COVERAGE, WHICH MEANS THAT CLAIMS MUST BE FIRST MADE DURING THE POLICY PERIOD. ALSO, COVERED CLAIM EXPENSES PAYABLE UNDER THE POLICY REDUCE AND MAY COMPLETELY EXHAUST THE LIMITS OF LIABILITY. PLEASE READ THE POLICY CAREFULLY AND DISCUSS IT WITH YOUR AGENT OR BROKER.**

Policy Number: 46 TE 0342080-21                     Renewal of Policy Number: 46 TE 0342080-20

**Named Insured**
    ADVAIYA SOLUTIONS INC

    Address
    14575 NE BEL RED RD,
    SUITE 201
    BELLEVUE, WA 98007

2. **Policy Period**       Start Date 10/07/21        End Date 10/07/22
                at 12:01 a.m. standard time at the address shown in item 1 above

3. Retroactive Date     10/07/19
                If the space above is left blank, coverage does not apply to any **wrongful act** committed before the Start Date stated in item 2 above.

4. Limits of Liability

|  |  |
|---|---|
| Each **Wrongful Act** Limit | 1,000,000 |
| Aggregate Limit | 1,000,000 |

5. Retention Each **Wrongful Act**       2,500

6. Premium       $2,918.00

7. Forms and Endorsements: This Declarations page, the policy and endorsements listed below and all changes later added to the policy by **us** in written endorsements constitute the entire insurance policy: SEE FORM GU207 (SCHEDULE OF FORMS AND ENDORSEMENTS)

8. Producer Name
    91676
    BIN INSURANCE HOLDINGS LLC

    Address
    30 N LA SALLE ST STE 2500
    CHICAGO, IL 60602

_Douglas Elliot_

_____                                         Date
**Countersignature**
**Authorized Representative**

GU207
(6-78)

# ENDORSEMENT

This endorsement, effective on 10/07/21 at 12:01 A.M standard time, forms a part of

Policy No.    46 TE 0342080-21 of the HARTFORD FIRE INSURANCE CO.

Issued to    ADVAIYA SOLUTIONS INC

*Douglas Elliot*

Douglas Elliot, President

## SCHEDULE

| | | |
|---|---|---|
| FS00G00700 | 10/16 | FAILSAFE GIGA ENTERPRISE LIABILITY CONTENTS |
| FS00G00300 | 10/16 | FAILSAFE GIGA ENTERPRISE LIABILITY |
| FS00H02600 | 10/16 | ADDRESS FOR WRONGFUL ACT OR CLAIM NOTIFICATION OR CORRESPONDENCE ENDORSEMENT |
| FS00H02800 | 07/18 | OTHER INSURANCE AND PAYMENTS AVAILABLE TO YOU WHEN OTHER POLICY ISSUED BY US |
| FS00H03200 | 07/18 | ENTERPRISE SERVICES AND TECHNOLOGY SERVICES FOR A FEE MODIFICATION ENDORSEMENT |
| FS00H03300 | 09/18 | DATA PRIVACY: LAWS, REGULATORY PROCEEDING AND WRONGFUL ACT REDEFINED |
| FS00H13700 | 10/16 | ASBESTOS EXCLUSION |
| FS00H14100 | 10/16 | UNSOLICITED SENDING OF INFORMATION EXCLUSION |
| FS00H15000 | 09/18 | RECALL AND REPLACEMENT COVERAGE |
| FS00H33300 | 10/16 | WAIVER OF RIGHTS OF RECOVERY PER CONTRACT REQUIREMENT |
| FS00H35700 | 10/16 | INDEPENDENT CONTRACTOR, TEMPORARY, OR LEASED PERSONNEL ENDORSEMENT |
| FS00H36000 | 10/16 | HAMMER CLAUSE MODIFICATION ENDORSEMENT |
| FS00H36200 | 10/16 | NEW SUBSIDIARY, MERGER, CONSOLIDATION OR ACQUISITION - SPECIALTY RISKS ENDORSEMENT |
| FS00H61000 | 07/18 | FIRST PARTY EXPENSE ENDORSEMENT WITH CYBER BREACH COACH NO RETENTION |
| FS00H90200 | 09/19 | WAR EXCLUSION WITH CYBER TERRORISM CARVE-BACK |

GU207
(6-78)

# ENDORSEMENT

This endorsement, effective on 10/07/21 at 12:01 A.M standard time, forms a part of

Policy No.     46 TE 0342080-21 of the HARTFORD FIRE INSURANCE CO.

Issued to     ADVAIYA SOLUTIONS INC

*Dougles Elliot*

Douglas Elliot, President

SCHEDULE

| | | |
|---|---|---|
| FS46H00400 | 10/16 | WASHINGTON CHANGES |
| HR46H00103 | 02/19 | WASHINGTON CANCELLATION AND NONRENEWAL ENDORSEMENT |

Rev. Ed. Date (04/02)
GU 207 (6-78)

# FailSafe®
## G I G A
_____

enterprise **liability**

# Contents

Pages 2 – 3
**Section I - Coverage**
    Page 2     A. Insuring Agreement
                B. Defense
    Page 3     C. When We Insure

Pages 3 – 13
**Section II - Definitions**

Pages 13 – 15
**Section III - Exclusions**

Page 15
**Section IV - Nuclear Energy Liability Exclusion**

Pages 15 - 16
**Section V - Limits of Liability and Retention**
    Page 15    A. Limits of Liability
Page 16           B. Retention for Each Wrongful Act

Pages 16 – 17
**Section VI - Extended Reporting Periods**
    Page 16    A. Terms Applicable to Both Types of Extended Reporting Period
                 B. Basic Extended Reporting Period
    Page 17    C. Optional Extended Reporting Period

Pages 17 – 21
**Section VII - Conditions**
    Page 17    A. Territory
                 B. Currency
    Page 18    C. Bankruptcy
                 D. Cancellation
                 E. When We Do Not Renew
                 F. Entire Agreement
                 G. Changes
                 H. Duties in the Event of Wrongful Act or Claim
    Page 19    I. Legal Action Against Us
                 J. Mergers, Consolidations or Acquisitions
    Page 20    K. Other Insurance and Payments Available to You
                 L. Payment of Premiums and Retention
    Page 21    M. Transfer of Rights of Recovery against Others to Us
                 N. Transfer of Your Rights and Duties Under This Policy
                 O. Representations and Statements



# Fail**Safe**®

## G I G A

e n t e r p r i s e  **l i a b i l i t y**

**This is a claims first made policy. Please read it carefully and contact your agent or broker if you have any questions. Your policy applies only to claims when:**

**the wrongful act occurs on or after the applicable Retroactive Date and before the end of the policy period, and**

**the claim is first made against any of you during the policy period and you use your best efforts to report such claim to us in writing as soon as practicable in accordance with the terms of this policy.**

**Covered claim expenses and damages within the Retention amount must be paid by you and do not reduce the Limits of Liability. Covered claim expenses and damages above the Retention amount are payable under this policy and reduce the Limits of Liability.**

**Some provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and what is not covered.**

The words "**we**," "**us**" and "**our**" refer to the stock insurance company member of THE HARTFORD shown on the Declarations Page of this policy.

The words "**you**" and "**your**" mean any person or entity described under the definition of "**you** or **your**" in Section II – Definitions.

All other words and phrases that appear in bold type are defined in Section II – Definitions.

In return for payment of the premium, and subject to all of the terms and conditions of this policy, including those changed, added or deleted by endorsements that **we** issue forming a part of this policy, **we** agree with **you** as follows:

Section I - **Coverage**

A. **Insuring Agreement**

**We** will pay on **your** behalf money in excess of the Retention that **you** become legally required to pay as **damages** and **claim expenses** because of a **claim** caused by a(n):

*Professional Liability*

1. **professional services wrongful act**;

*Data Privacy and Network Security Liability*

2. **data privacy wrongful act**, including the actual or alleged failure to comply with **your** written and publicly available policies, procedures, and standards for the collection, use and disclosure of **nonpublic personal information**;

3. actual or alleged failure to provide any required notices in connection with any part of a **data privacy wrongful act**; or

4. **network wrongful act**.

B. **Defense**

1. For all covered **claims** made in the United States of America, its territories and possessions, Puerto Rico or Canada, **we** have the right and duty to defend **you**. **We** have the right to appoint counsel. **We** may investigate any **claim** as **we** deem appropriate.

2. For all covered **claims** made outside the United States of America, its territories and possessions, Puerto Rico or Canada, **we** have the right but not the duty to defend **you**, appoint counsel and investigate. If **we** choose not to defend, appoint counsel and investigate such a **claim**, the **first named insured** under **our** supervision will arrange for investigation and defense of the **claim** as reasonably appropriate. Subject to the Limits of Liability, **we** will reimburse the **first named insured** for paying **damages** or **claim expenses** for covered **claims**.

3. The following terms apply to all covered **claims**, wherever they are made:

   a. **You** will not settle any **claim** without **our** prior written consent, even if the **claim** is less than the amount of the Retention. **We** have the right to settle all **claims**, wherever made, unless **we** receive a written objection from the **first named insured** before **we** agree to a settlement. The **first named insured** will be notified before **we** agree to a settlement. If the **first named insured** objects to a settlement recommended by **us** and acceptable to the claimant, then **our** duty to pay will be limited to:

      (1) the amount of **damages** for which the **claim** could have been settled; plus

      (2) all **claim expenses** incurred and paid or payable by **us** or the **first named insured** at the time **we** made **our** recommendation; plus

      (3) fifty percent (50%) of all covered **damages** and **claim expenses** incurred and paid or payable by **us** or the **first named insured** after the time **we** made **our** recommendation.

      If the total of these amounts falls within **your** Retention, **we** will have no duty to pay **damages** and **claim expenses** on that **claim**.

      In no event will **we** be obligated to pay more than the remaining applicable Limit of Liability determined under Section V – Limits of Liability and Retention.

      In **claims** where the **first named insured** has objected to a settlement recommended by **us**, **we** have the right to stop defending and paying **claim expenses** upon tendering control of the defense to **you**.

    b.  **We** have the right to exercise all of **your** rights in choosing arbitrators and in conducting all arbitrations.

    c.  **Our** right and duty to defend **claims** and to pay or reimburse for **claim expenses** will end when **we** have used up the applicable Limit of Liability by paying **damages** and/or **claim expenses**.

4.  At **our** discretion, and with **your** consent, **we** may pay early intervention costs incurred to investigate a **wrongful act** reported to **us** that may result in a **claim**. Such costs may be paid during the time between when such **wrongful act** is reported and the time a **claim** is made to **us**, per Section VII – Conditions, Duties in the Event of a Wrongful Act or Claim, and will reduce the Limits of Liability. Should such early intervention costs be incurred for what becomes an actual **claim**, such intervention costs will be deemed **claims expenses**, and therefore, subject to **your** Retention obligation.

C.  **When We Insure**

This policy applies to a **wrongful act** only if all the terms in 1 through 3 below are met:

1.  the **wrongful act** was committed on or after the applicable Retroactive Date shown in the Declarations and before the end of the **policy period**;

2.  before the Start Date of this policy shown in the Declarations, no **specified insured** knew of or should have reasonably known of:

    a.  a **wrongful act**; or

    b.  any fact(s) or circumstance(s)

  which could reasonably be expected to result in a **claim**; and

3.  the **claim** because of the **wrongful act** is:

    a.  first made against any of **you** during the **policy period**; and

    b.  reported to **us** in writing by **you** using **your** best efforts to notify **us** as soon as practicable after any **specified insured** becomes aware of it.

All **claims** arising from the same **wrongful act** are considered to be one **claim**.

A **claim** is deemed first made when the earliest of the following occurs:

  any of **you** receive written notice of such **claim**; or

  subject to the Section VII – Conditions, Duties in the Event of Wrongful Act or Claim, **we** receive from **you** or **your** agent written notice of the **wrongful act**, which later results in a **claim**.

A **claim** is deemed reported to **us** when **we** first receive it in writing.

## Section II – <u>Definitions</u>

- **actual income loss** means the net profit before taxes that **you** would have earned or incurred during the **period of restoration** had there not been a **network outage**. **Actual income loss** will be calculated on an hourly basis and limited to the **period of restoration**.
- **business interruption loss** means the sum of **actual income loss** and **extra expense** resulting from a **network outage**.

  **business interruption loss** does not include any:

1.  contractual liability or the value of, or associated with, any cancelled contract, including but not limited to any sums due pursuant to a contractual provision for liquidated damages, agreed penalties, or similar remedy;

2. costs or expenses incurred to update, replace, restore, or improve the **computer system**;

3. costs or expenses incurred to identify or remediate vulnerabilities or errors in the **computer system**;

4. **damages**;

5. **claim expenses**;

6. other **first party expenses**; or

7. amounts that are uninsurable pursuant to applicable law.

- **claim** means a written demand received by any of **you** for **damages** or injunctive relief. This includes a suit, arbitration or other type of alternative dispute resolution proceeding against any of **you**. It also includes a request to toll or waive the running of the statute of limitations. It does not include a request by **you** for reimbursement of **first party expenses**, nor does it include a **data privacy regulation proceeding**.

- **claim expenses** means reasonable expenses incurred by **us** or by **you** with **our** prior written consent investigating and defending a **claim**.

  1. **claim expenses** also include:

     a. the cost of bonds to release attachments, but only for bond amounts within the remaining applicable Limit of Liability. **We** do not have to furnish these bonds;

     b. costs taxed against **you** in the suit. However, these payments do not include attorney's fees or attorney's expense taxed against **you**;

     c. interest on the full amount of any judgment that accrues before or after entry of the judgment and before **we** have paid, offered to pay or deposited in court the part of the judgment that is within the remaining applicable Limit of Liability; and

     d. actual loss of earnings up to $1,000 per day for each of **you** that **you** personally incur because of time off from work at **our** request to help **us** investigate or defend a **claim**.

  2. **claim expenses** do not include any **first party expenses** or any of **your** overhead expenses or any salaries, wages, fees, or benefits of any **you**.

- **computer system(s)** means the following, if leased or owned by the **named insured**, or operated by a **third party service provider**: computers, input and output devices, network devices and equipment, peripheral devices, storage devices, back-up facilities, mobile devices, and associated computer programs, software and applications, including cloud-based computer programs, software and applications.

- **contract worker agreement** means a signed agreement between the **named insured** and an individual person who is an agent or independent contractor when the agreement provides that:

  1. the agent or independent contractor will provide specific **enterprise services** on behalf of the **named insured**;

  2. the **named insured** will indemnify the agent or independent contractor for those **enterprise services**; and

  3. the agreement is made before any **wrongful act** that may give rise to a **claim**.

- **crisis management expenses** means reasonable and necessary fees and expenses:

  1. charged by a **crisis management firm** in the performance of **crisis management services**; and

  2. for printing, advertising, mailing of materials, or travel by an **executive officer**, partner, owner, employee, agent of the **named insured**, or the **crisis management firm** as a direct response to a **data privacy wrongful act**.

  **crisis management expenses** do not include any of **your** overhead expenses or any salaries, wages, fees, or benefits of any **you**, nor do they include any amounts that are uninsurable pursuant to applicable law.

- **crisis management firm** means any public relations or law firm hired or appointed by **us** or by **you** to perform **crisis management services** in connection with a **data privacy wrongful act**.

- **crisis management services** means those services performed by a **crisis management firm** to minimize potential harm to the **named insured** arising from a **data privacy wrongful act,** including:

  1. maintaining and restoring public confidence in the **named insured**;

  2. providing advice to the **named insured** in connection with such **data privacy wrongful act**;

  3. determining the **named insured's** legal obligations under **data privacy laws**;

  4. providing necessary legal services to the **named insured** in responding to a **data privacy wrongful act**; and

  5. communicating prior to a **claim** or **data privacy regulatory proceeding** with regulators, consumers, and clients regarding a **data privacy wrongful act**.

- **cyber extortion expenses** means those reasonable and necessary expenses incurred by the **named insured** as a result of a **cyber extortion threat** including **cyber extortion payments**.

  **cyber extortion expenses** do not include any of **your** overhead expenses or any salaries, wages, fees, or benefits of any **you**, nor do they include any amounts that are uninsurable pursuant to applicable law.

- **cyber extortion payments** means necessary monetary amounts paid by the **named insured** to a party who is not insured under this policy and whom the **named insured** believes to be responsible for the **cyber extortion threat**.

- **cyber extortion threat** means any credible threat by a person or organization against the **named insured** to:

  1. cause a **network intrusion**;

  2. alter, damage, encrypt, render inaccessible, or continue to render inaccessible any computer program, software or electronic data that is stored within the **computer system**;

  3. release, disseminate, destroy, or use **nonpublic personal information** obtained from the **computer system** through a **network intrusion**; or

  4. release, disseminate, destroy, or use **third party corporate confidential information**.

  The foregoing notwithstanding, any such threat will not constitute a **cyber extortion threat** unless, prior to the surrendering of property or other consideration as payment by or on behalf of the **named insured**, the **named insured** conducts a reasonable investigation and determines that such threat is technologically credible.

  All **cyber extortion threats** that are logically or causally connected by common facts, circumstances, situations, events, transactions and/or decisions are considered one **cyber extortion threat** occurring on the earliest date such **cyber extortion threat** was first made.

- **cyber investigation expenses** means those reasonable and necessary expenses incurred by the **named insured** to:

  1. conduct an investigation of the **computer system** by a third party to determine the source or cause of a **data privacy wrongful act** or **network intrusion**; and

  2. retain the services of a PCI Forensic Investigator to comply with the terms of the **named insured's payment card agreement**.

  **cyber investigation expenses** do not include any of **your** overhead expenses or any salaries, wages, fees, or benefits of any **you**, nor do they include any amounts that are uninsurable pursuant to applicable law.

- **damages** means a money award, judgment or settlement that **you** become legally required to pay, including punitive, exemplary and multiplied damages where insurable by law.

**damages** do not include:

1. any kind of: refund, rebate, redemption coupon, offset, return or credit that has been paid to or by any of **you**, or that is owed to or by any of **you**; examples include but are not limited to any of the following: any licensing fee or other fee, royalty, subscription or access charge, or other charge;

2. disgorgement of profits or any money or credits that represent any gain, profit or advantage to which any of **you** are not legally entitled;

3. **your** cost to comply with any non-money or injunctive relief;

4. cost or expense to recall, upgrade, replace, repair, correct, complete or re-perform **enterprise services**, in whole or part, by:

   a. any of **you**; or

   b. another party if any of **you** had the opportunity to recall, upgrade, replace, repair, correct, complete or re-perform **enterprise services**;

5. any criminal: fine or penalty;

6. any payment any of **you** make without **our** prior written consent;

7. the purchase or contract price for **your enterprise services**; or

8. any **first party expenses** or any of **your** overhead expenses or any salaries, wages, fees, or benefits of any **you**.

In accordance with the foregoing, insurable punitive, exemplary and multiplied damages will be covered based upon the law of the most favorable of the following jurisdictions to **you**:

a. where the punitive, exemplary or multiplied damages are imposed or awarded;

b. where the **claim** resulting in punitive, exemplary, or multiplied damages occurred;

c. where the **wrongful act** giving rise to a **claim** that resulted in punitive, exemplary, or multiplied damages occurred;

d. where the **named insured** against whom punitive, exemplary, or multiplied damages are imposed or awarded is incorporated, resides or has their principal place of business; or

e. where **we** are incorporated or have **our** principal place of business.

- **data privacy laws** means any local, state, federal or foreign laws, statutes and regulations governing the collection, control, confidentiality, sharing, or use of **nonpublic personal information**. **Data privacy laws** include but are not limited to:

1. Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) (HIPAA);

2. Health Insurance Technology for Economic and Clinical Health Act of 2009 (HITECH);

3. Gramm-Leach-Bliley Act of 1999, also known as, the Financial Services Modernization Act of 1999;

4. The Family Educational Rights and Privacy Act ("FERPA");

5. Children's Online Privacy Protection Act of 1998 ("COPPA");

6. Section 5(a) of the Federal Trade Commission Act but solely for alleged unfair and deceptive acts or practices resulting in a **data privacy wrongful act** or **network wrongful act**; or

7. State privacy protection and breach notification laws, including but not limited to the California Database Protection and breach notification laws, including but not limited to the California Database Protection Act of 2003 (Cal. SB 1386) and California A.B. 1950.

■ **data privacy regulatory expenses** means:

1. reasonable and necessary legal fees and expenses incurred by the **named insured** in the defense of a **data privacy regulation proceeding**;

2. fines or penalties assessed in connection with a **data privacy regulation proceeding**; and

3. amounts which the **named insured** is legally obligated to deposit in a fund as equitable relief, including consumer redress funds, due to a settlement or adverse judgment in a **data privacy regulation proceeding**.

**data privacy regulatory expenses** do not include any of **your** overhead expenses or any salaries, wages, fees, or benefits of any **you**, nor do they include any amounts that are uninsurable pursuant to applicable law.

■ **data privacy regulation proceeding** means a civil, administrative or regulatory proceeding against, or a civil investigation of, a **named insured** by a governmental agency commenced by an investigative demand or similar request for information or by a complaint or similar pleading, alleging violation of any **data privacy law** as a result of a **data privacy wrongful act** or a **network wrongful act**.

■ **data privacy wrongful act** means any act, error or omission by **you** or a **rogue employee** that results in:

1. the improper collection, control, disclosure or use of **nonpublic personal information**;

2. a violation by the **named insured** of a **data privacy law**; or

3. the improper disclosure or use of **third party corporate confidential information**.

■ **data restoration expenses** means the actual, reasonable, and necessary expenses incurred by **you** to restore, replace or recover a computer program, software, application or other electronic data that is altered, destroyed, stolen, impaired or erased as a result of a **network intrusion**.

If **you** determine that such computer program, software, application or other electronic data cannot be reasonably restored, replaced or recovered, then **data restoration expenses** means only the reasonable and necessary costs incurred by **you** to reach this determination.

**data restoration expenses** do not include costs or expenses incurred to:

1. identify or remediate any errors or vulnerabilities or to update, restore, replace, upgrade, maintain, or improve any **computer system**;

2. duplicate the research that led to the development of the **named insured's** computer program, software, application, other electronic data or any proprietary or confidential information or intellectual property; or

3. develop or purchase any computer program, software, application or other electronic data.

Nor do **data restoration expenses** include:

a. the economic or market value of any **computer system**, computer program, software, application or other electronic data;

b. any amounts that are uninsurable pursuant to applicable law; or

c. any of **your** overhead expenses or any salaries, wages, fees, or benefits of any **you**.

■ **denial of service attack** means a malicious attempt by a third party to restrict or prevent access to the internet, or computer program, software or application within the **computer system**.

- **enterprise services** means the tangible and intangible work product and services **you** provide to others for a fee or other remuneration. **Enterprise services** include, but are not limited to, **technology services**. **Enterprise services** expressly do not include any violations of law, rule or regulations related to one's status as, or any performance or failure to perform services as an accountant, architect, civil or structural engineer, dental or medical health care professional, insurance agent or broker, lawyer, mortgage broker or banker, real estate agent or broker, or surveyor.

- **executive officer** means a director or officer in a position created by **your** charter, constitution, by-laws or any other similar governing document.

- **extra expense** means actual, reasonable and necessary expenses incurred by **you** to reduce, minimize, or stop a **network outage,** but only to the extent such expenses are in excess of the **your** normal operating expenses, including but not limited to, any of **your** overhead expenses or any salaries, wages, fees, or benefits of any of **you.**

- **first named insured** means the **named insured** first listed in item 1 of the Declarations.

- **first party expenses** means the following expenses incurred by the **named insured**:

  1. **business interruption loss**;

  2. **crisis management expenses**;

  3. **cyber extortion expenses**;

  4. **cyber investigation expenses**;

  5. **data privacy regulatory expenses**;

  6. **data restoration expenses**;

  7. **notification and identity protection expenses**; and

  8. **pci expenses**.

- **interrelated wrongful act** means multiple **wrongful acts** that are logically or causally connected by common facts, circumstances, situations, events, transactions and/or decisions. **Interrelated wrongful acts** that occur before the end of the last technology errors and omissions/liability policy issued by an insurance company member of The Hartford are considered one **wrongful act** occurring on the date the earliest such **wrongful act** is committed. An **interrelated wrongful act** is subject to the Each **Wrongful Act** Limit.

- **named insured** means:

  1. the persons or entities listed in item 1 of the Declarations; and

  2. any **subsidiary**.

- **network intrusion** means the gaining of access to or use of the **computer system** by an unauthorized person, or by an authorized person in an unauthorized manner, including but not limited to the transmission of malicious code to or participation in a **denial of service attack** against computer systems that are not owned, operated or controlled by **you.**

  All **network intrusions** that are logically or causally connected by common facts, circumstances, situations, events, transactions and/or decisions are considered one **network intrusion** occurring on the earliest date such **network intrusion** first occurred.

- **network outage** means the actual and measurable failure, interruption, degradation, suspension or delay in service or the failure of the **computer system** directly resulting from a **network intrusion** or a **denial of service attack**.

  All **network outages** that are logically or causally connected by common facts, circumstances, situations, events, transactions and/or decisions are considered one **network outage** occurring on the earliest date such **network outage** first occurred.

- **network wrongful act** means any act, error or omission by **you**, a **rogue employee**, or a **third party service provider**, which results in a **network intrusion**.

- **nonpublic personal information** means:

  1. a natural person's name; address; unpublished telephone number; social security number; driver's license or state identification number; credit, debit or other financial account number; medical information; education records; username; passwords or personal identification numbers; website cookies; geolocation data; or any other information that would allow access to the natural person's financial or medical account; or

  2. any other information of a natural person that is designated as private or confidential by any local, state, federal or foreign laws, statutes or regulations.

  Notwithstanding the foregoing, nonpublic personal information does not include information that is lawfully available to the general public.

- **notification and identity protection expenses** means reasonable and necessary expenses incurred by **you** to:

  1. notify individuals, customers or clients of a **data privacy wrongful act** in compliance with a **data privacy law**;

  2. voluntarily notify individuals, customers and clients of a **data privacy wrongful act**;

  3. establish call center services to answer calls following notification of a **data privacy wrongful act**; and

  4. provide credit monitoring; identity monitoring; medical identity monitoring; account monitoring; fraud detection and alerts; identity theft insurance; and identity protection or restoration services to individuals in response to a **data privacy wrongful act**.

  **notification and identity protection expenses** do not include any of **your** overhead expenses or any salaries, wages, fees, or benefits of any **you**, nor do they include any amounts that are uninsurable pursuant to applicable law.

- **payment card agreement** means a contract between **you** and a financial institution, payment card company, payment card processor, or merchant that establishes the terms and conditions for accepting and processing payment cards.

- **pci expenses** means the monetary fines, expenses, assessments, or fraud reimbursements that **you** are legally obligated to pay or incur under the terms of a **payment card agreement** as a result of a **data privacy wrongful act** or a **network wrongful act**.

  **pci expenses** do not include: any of **your** overhead expenses or any salaries, wages, fees, or benefits of any **you**; any charge backs, interchange fees, service charges, cost or expenses for system improvements, or any other costs or expenses related thereto; or any amounts that are uninsurable pursuant to applicable law.

- **period of restoration** means the period of time that begins with the date and time of the **network outage** after application of the waiting period set forth on the Declarations and ends on the date and time the **computer system** is or could have been restored to substantially the level of operation that had existed prior to the **network outage**. The foregoing notwithstanding, in no event shall the **period of restoration** exceed the number of days set forth in the Declarations.

- **personal injury** means:

  1. any form of defamation or disparagement causing harm to the character, reputation or feelings of any person, entity, product or service, including but not limited to libel, slander, product or service disparagement, trade libel, infliction of emotional distress, outrage or outrageous conduct;

  2. any form of invasion, infringement or interference with rights of publicity or privacy, including but not limited to false light, public disclosure of private facts, intrusion and commercial appropriation of name or likeness;

  3. wrongful entry or eviction, trespass, eavesdropping or other invasion of the right of private occupancy; and

  4. malicious prosecution or false: arrest, detention or imprisonment.

- **policy period** means the time beginning with the Start Date shown in the Declarations and ending with the earlier of:

    1.  the date of termination or cancellation; or

    2.  the End Date shown in the Declarations.

- **pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil product, radiation, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. **Pollutants** also means any substance located anywhere in the world identified on a list of hazardous substances issued by any federal agency (including, nonexclusively, the Environmental Protection Agency) or any state, county, municipality or locality or counterpart thereof, or any foreign equivalent thereof.

- **professional services wrongful act** means the following when actually or allegedly committed by **you**, a **rogue employee**, or on **your** behalf:

    1.  an error, unintentional omission, or negligent act in **your** performance of **enterprise services**;

    2.  a breach of warranties or representations about the fitness, quality, suitability, performance or use of **your enterprise services**;

    3.  the failure of **your enterprise services** to perform the function or serve the purpose intended; and

    4.  a **security wrongful act** in **your** performance of **enterprise services**.

- **rogue employee** means any past or present employee of any **named insured** who acts or acted outside the scope of his or her employment to intentionally cause a **wrongful act**. **Rogue Employee** does not include any **specified insured**.

- **security wrongful act**:

    1.  failure to prevent:

        a.  denial of service;

        b.  disruption of service;

        c.  unauthorized access to, unauthorized use of, repudiation of access to, tampering with or introduction of malicious code into: firmware, data, software, systems or networks;

        d.  identity theft or disclosure of **nonpublic personal information**; or

        e.  disclosure of **third party corporate confidential information**; and

    2.  the improper collection, control, or use of **nonpublic personal information**.

- **specified insured** means:

    1.  any **named insured** including the spouse and/or domestic partner of a **named insured** that is an individual;

    2.  any past or present partner, **executive officer,** or any individual in an equivalent position of a **named insured**, including but not limited to individuals that hold management positions similar to an **executive officer** for any **named insured** that does not have a charter, constitution, by-laws or any other similar governing document;

    3.  any individual responsible for the insurance, legal, or financial matters of the **named insured** including but not limited to General Counsel, Risk Manager, or Insurance Manager of the **named insured**;

    4.  any member of the **named insured** that could be afforded coverage under this policy; or

5.  the executors, administrators or legal representatives of 1, 2, 3, or 4 listed above in the event of a death, incapacitation or bankruptcy of 1, 2, 3 or 4 listed above; but this only applies while performing their duties as such.

**specified insured** does not include any **rogue employee**.

■   **subsidiary** means any corporation of which the **first named insured** owns, directly or indirectly, more than fifty percent (50%) of the issued and outstanding voting stock. The stock must be owned by the **first named insured** on the Start Date shown in the Declarations of this policy.

1.  **Subsidiary** also includes any corporation which becomes a **subsidiary** during the **policy period**, provided that as soon as practical, but no later than within ninety (90) days of its becoming a **subsidiary**, **you** have:

    a.  provided **us** with full details of the new **subsidiary** including a completed and signed **subsidiary** application and any other underwriting information **we** may require;

    b.  agreed to and paid any additional premium related to the **subsidiary**; and

    c.  agreed to any change in the terms and conditions of this policy required by **us** relating to the new **subsidiary**.

2.  This policy does not apply to any **claim** or **first party expense** arising from or involving a **subsidiary** for any **wrongful act**, **cyber extortion threat**, **network intrusion**, or **network outage** that was committed when the **first named insured** did not own directly or indirectly more than fifty percent (50%) of the issued and outstanding voting stock of the **subsidiary**.

■   **technology services** means the following services performed for others for a fee or remuneration:

1.  consulting, analysis, design, installation, training, maintenance, support and repair of or on: software, wireless applications, firmware, shareware, networks, systems, hardware, devices or components;

2.  integration of systems;

3.  processing of, management of, mining or warehousing of data;

4.  administration, management, operation or hosting of: another party's systems, technology or computer facilities;

5.  website development; website hosting;

6.  internet access services; intranet, extranet or electronic information connectivity services; software application connectivity services;

7.  manufacture, sale, licensing, distribution, or marketing of: software, wireless applications, firmware, shareware, networks, systems, hardware, devices or components;

8.  design and development of: code, software or programming;

9.  providing software application: services, rental or leasing;

10. screening, selection, recruitment or placement of candidates for temporary or permanent employment by others as information technology professionals;

11. **telecommunication services**;

12. **telecommunication products**; and

13. web related software and connectivity services performed for others.

■   **telecommunication products** means computer hardware, firmware and/or software products, electronic equipment or devices manufactured, sold, handled, distributed or disposed of by **you** which are specifically designed or intended for use in telecommunication systems or **your telecommunication services**.

- **telecommunication services** means the following services performed for others:

  1. telephone services including competitive access provider, dial tone access, digital subscriber line (DSL), incumbent/ local exchange carrier, facsimile, integrated services digital network (ISDN), interconnection, local, long distance, reseller, switching, and 911 emergency services;

  2. means call conferencing, call forwarding, call identification, call return, call waiting, calling card, directory assistance, repeat dialing, speed dial, toll free, video conferencing, voice messaging services;

  3. cellular and wireless communication services including paging and ground based satellite communication services;

  4. provision of cable television services; and

  5. telecommunication consulting services.

- **temporary worker** means a person who is provided to **you** by a third party for a specific time period to support or increase **your** work force in special situations. Such situations may include employee absences, temporary skill shortages and seasonal workloads. A temporary worker is not an employee of **yours**.

- **third party corporate confidential information** means third party corporate information provided to **you** and protected under a nondisclosure agreement or confidentiality provision of a contract entered into by the **named insured** with the owner of the third party corporate information.

- **third party service provider** means an independent contractor operating on behalf of the **named insured** pursuant to a written contract or agreement with the **named insured** but only if such independent contractor is acting within the scope of the terms of the written contract or agreement for the benefit of the **named insured**.

- **wrongful act** means the following:

  1. **data privacy wrongful act**;

  2. **network wrongful act**;

  3. **professional services wrongful act**; and

  4. **security wrongful act**.

  **Wrongful act** also includes an **interrelated wrongful act**. **Wrongful act** includes any of the foregoing when caused by the acts of a **rogue employee**.

- **you** or **your** mean, individually and collectively:

  1. any **named insured**;

  2. any past or present partner, **executive officer,** or any individual in an equivalent position of a **named insured**, including but not limited to individuals that hold management positions similar to an **executive officer** for any **named insured** that does not have a charter, constitution, by-laws or any other similar governing document, but only while performing their duties as such;

  3. any past or present employee of the **named insured** but only while performing their duties as such; employee does not include a **temporary worker**;

  4. any individual person who is an agent or independent contractor but only while acting within the scope of his or her **contract worker agreement** with the **named insured**;

  5. a client that the **named insured** is required, in a written contract to perform **enterprise services**, to add as an additional insured under this policy. But the client is insured under this policy only if:

     a. the **wrongful acts** were committed by the **named insured** in the **named insured's** performance of **enterprise services**;

   b.  the written contract is entered before the **wrongful act** giving rise to the **claim** is committed; and

   c.  there are no allegations of independent misconduct by the client.

6.  any member or stockholder of the **named insured**; but this only applies with respect to their liability as a member or stockholder; or

7.  the executors, administrators or legal representatives of each of **you** listed in items 1 through 6 above in the event of **your** death, incapacity or bankruptcy; but this only applies while performing their duties as such.

## Section III – <u>**Exclusions**</u>

A.  **We** will not pay **damages**, **first party expenses**, or **claim expenses** or defend any of **you** for any **wrongful act** or **claim** arising out of or in any way related to any actual or alleged:

1.  bodily injury, sickness, disease or death sustained by a person; or mental anguish, emotional distress, mental injury, fright or shock when they result in or from bodily injury, sickness, disease or death;

2.  physical damage to or physical loss of tangible property and any resulting loss, corruption or destruction of data or information, including all resulting loss of use of that property, data or information. However, this exclusion will not apply to:

   a.  the loss, corruption or destruction of data or information when the tangible property on which the data or information is or was kept is not physically damaged or physically lost; and

   b.  that portion of a **claim** due to a **data privacy wrongful act** as a result of the loss of the **named insured's** leased or owned computer hardware, including mobile, networked, and data storage equipment;

3.  obligation which any of **you** may have to pay under any workers' compensation act, employer's liability law, unemployment compensation law, disability benefits law, or any similar law; or any foreign equivalent;

4.  disruption of, surge in, fluctuation in or loss of: power, connectivity or communications. However, this exclusion will not apply to any of the foregoing when directly caused by a **wrongful act** committed by any of **you**;

5.  withdrawal or recall of all or part of **enterprise services** from the marketplace. However, this exclusion will not apply to **claims** by third parties for the loss of use resulting from withdrawal or recall of **enterprise services** due to a **wrongful act** committed by any of **you**;

6.  cost: overruns, guarantees, estimates or estimates being exceeded;

7.  false, deceptive, fraudulent, intentionally misleading or misrepresenting statements in advertising;

8.  sweepstakes, lotteries or other games of chance; or contests;

9.  price fixing, or any other violation of: any securities, antitrust or restraint of trade laws, the Racketeer Influenced and Corrupt Organizations Act; any similar law; or any foreign equivalent;

10.  Section 616 of the Fair Credit Reporting Act; any actual or alleged violation of Section 605(g) of the Fair Credit Reporting Act;

11.  false, deceptive, or unfair business or trade practices; unfair competition; or violation of consumer protection laws, any similar law, or any foreign equivalent. However, this exclusion will not apply to that portion of a **claim** alleging the violation of a **data privacy law;**

12.  violation or misuse of any intellectual property right, including but not limited to:

   a.  infringement or dilution of: title, slogan, trademark, trade name, trade dress, service mark or service name;

   b.  infringement of copyright, plagiarism or misappropriation of ideas;

   c.  piracy;

   d.  patent infringement or patent misuse; or

   e.  misuse, misappropriation or theft of trade secrets;

13. **personal injury**;

14. tortious interference with the contractual relationships of others;

15. discrimination, harassment or misconduct by any of **you** because of or relating to: race, creed, color, age, gender, sex, sexual preference or orientation, national origin, religion, disability, handicap, health condition, marital status, or any other class protected under federal, state, local or other law; or any similar law in a jurisdiction outside the United States of America;

16. acts or omissions by any of **you** regarding:

   a.  refusal to employ;

   b.  termination of a person's employment;

   c.  employment-related practices, policies, acts or omissions; these include but are not limited to coercion, demotion, evaluation, re-assignment, discipline, defamation, harassment, humiliation or discrimination; or

   d.  breach of fiduciary duty or other responsibility in connection with any employee benefit or pension plan; this includes but is not limited to violation of the duty or responsibility imposed on fiduciaries by the Employee Retirement Income Security Act of 1974 (ERISA) or any changes to that law; any similar law; or any foreign equivalent;

17. or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants** or any loss, cost or expense arising out of any:

   a.  request, demand, order or statutory or regulatory requirement that any of **you** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of **pollutants**; or

   b.  **claim** or suit by or on behalf of a governmental authority for **damages** because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **pollutants**; or

18. electromagnetic radiation, including but not limited to magnetic energy, waves, fields, or forces.

B.  **We** will not pay **damages** or **claim expenses** or defend any of **you** for any **claim** made by or on behalf of:

1. any of **you**; however, this exclusion will not apply to **claims** made:

   a.  by any of **you** described in items 3, 4 or 5 of the definition of **you** when the **claim** is made in their capacity as a client as a result of **enterprise services** performed by the **named insured** on their behalf; or

   b.  against the **named insured** by any of **you** described in items 3 or 4 of the definition of **you** when the **claim** is the result of the **named insured's** failure to prevent identity theft or disclosure of **nonpublic personal information**.

2. any entity which is a parent, affiliate, **subsidiary**, joint venturer, co-venturer or other entity in which any of **you** owns an interest or is a partner, director, officer, sole proprietor, trustee or employee;

3. any entity affiliated with any of **you** through any common ownership or control;

4. any entity directly or indirectly controlled, operated or managed by any of **you**; or

5.    any federal, state or local government body, subdivision or agency; any regulatory or licensing agency or bureau; or any foreign equivalent. However, this exclusion will not apply when the **claim** is made in their capacity as a client as a result of **enterprise services** performed by the **named insured** on their behalf.

For the purposes of exclusions B.2 through 4 above, the words "owns," "ownership or control" and "controlled" mean ten percent (10%) or more ownership of a publicly-held corporation or thirty percent (30%) or more ownership of a privately-held corporation, or ten percent (10%) or more of any other type of entity.

C.    **We** will not pay **damages**, **first party expenses**, or **claim expenses** for any **wrongful act**, **cyber extortion threat**, **network intrusion**, **network outage**, or **claim** arising out of or in any way related to any:

1.    dishonest, fraudulent, criminal or intentional wrongful act or omission by any of **you**; or

2.    material defect or bug known by any of **you** that could reasonably be expected to cause harm;

when such act or knowledge is established by **your** admission or final adjudication by a jury, court or arbitrator.

However, exclusions C.1 and 2 above do not apply to any of **you** who did not commit, acquiesce in, or remain passive after learning of the actions giving rise to the **claim**. For purposes of this exclusion, the knowledge, action or inaction of any **executive officer**, partner, or any individual in an equivalent position of a **named insured**, including any individual that holds a management position similar to an **executive officer** for **named insureds** that do not have a charter, constitution, by-laws or any other similar governing document, will be imputed to the applicable **named insured**.

D.    **We** will not pay **damages**, **first party expenses**, or **claim expenses** or defend any of **you** for any **claim** arising out of or in any way related to any actual or alleged **wrongful act, cyber extortion threat, network intrusion, network outage**, or **claim** that has been reported under any other policy, issued by any entity, when the inception date of that other policy preceded the Start Date of this policy.

## Section IV – **Nuclear Energy Liability Exclusion**

A.    **We** will not pay **damages**, **first party expense**, or **claim expenses** or defend any of **you** for any **wrongful act** or **claim** arising out of or in any way related to any:

1.    actual, alleged or threatened discharge, dispersal, release or escape of nuclear material, nuclear waste or radiation; or

2.    direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize, nuclear material, nuclear waste or radiation.

## Section V – **Limits Of Liability And Retention**

A.    **Limits of Liability**

1.    Each **Wrongful Act** Limit

Subject to A.2 below, the Each **Wrongful Act** Limit stated in item 4 of the Declarations is the most **we** will pay for any combination of **claim expenses** and **damages** for the total of all **claims** made during the **policy period**, including any applicable Extended Reporting Period, arising from one **wrongful act**, regardless of the number of:

a.    **you** this policy covers;

b.    **claims** that are made; or

c.    persons or entities making **claims**.

An **interrelated wrongful act** is subject to the Each **Wrongful Act** Limit.

2.  Aggregate Limit

    The Aggregate Limit stated in item 4 of the Declarations is the most **we** will pay for any combination of **claim expenses** and **damages** for the total of all **claims** made during the **policy period**, including any applicable Extended Reporting Period, regardless of the number of:

    a.  **you** this policy covers;

    b.  **claims** that are made;

    c.  persons or entities making **claims**; or

    d.  **wrongful act** that are committed.

B.  **Retention for Each Wrongful Act**

    The Retention stated in item 5 of the Declarations is the amount of money **you** must pay for covered **damages** and/or **claim expenses** for each **wrongful act** before this policy will begin to pay. **You** may not insure the Retention. The Retention will not be reduced by the payment of any deductible amount or any amount retained by any of **you** under any other policy of insurance; and the Retention will not be reduced by any payment made on **your** behalf by another person or entity. The Retention will not reduce the Limits of Liability.

    **You** will pay the full amount of the Retention for each **wrongful act** to appropriate parties as directed by **us**. If **we** advance any such payments, **you** will reimburse **us** within thirty (30) days of **our** written demand. If **you** fail to make direct payments or to reimburse **us** as described above, all of **you** against whom the **claim** has been made and the **named insured** are individually and collectively responsible for paying **us** back for any advance payments **we** have made and for interest, attorney's fees and costs associated with **our** collection of the money.

## Section VI – **Extended Reporting Periods**

A.  **Terms Applicable to Both Types of Extended Reporting Period**

    An Extended Reporting Period changes the time within which a **claim** may be made against **you** and still be reported by **you**, and considered by **us**, for coverage in accordance with the terms of this policy. This policy has two types of Extended Reporting Periods: the Basic Extended Reporting Period and the Optional Extended Reporting Period. Both the Basic Extended Reporting Period and the Optional Extended Reporting Period:

    1.  provide coverage for **claims** that are first made against **you** during such applicable Extended Reporting Period, but:

        a.  **we** will not pay **damages** or **claim expenses** or defend any of **you** for any **wrongful act** or **claim** arising out of or in any way related to any actual or alleged **wrongful act** that is committed during an Extended Reporting Period; and

        b.  only if, there is no other insurance for the **claim**;

    2.  do not extend the **policy period** or add to the scope of coverage provided as of the end of the **policy period**;

    3.  do not reinstate or increase the Limits of Liability. The Limits of Liability for any Extended Reporting Period will be a part of, and not in addition to, the Limits of Liability listed in the Declarations for the **policy period**;

    4.  run concurrently (if the Optional Extended Reporting Period is purchased); and

    5.  are not renewable.

B.  **Basic Extended Reporting Period**

    **We** will automatically provide a Basic Extended Reporting Period if this policy is:

    1.  cancelled;

2.   non-renewed; or

3.   renewed by **us** with insurance that does not apply on a **claims** made or **claims** made and reported basis.

The Basic Extended Reporting Period begins with the end of the **policy period** and lasts for ninety (90) days.

C.   **Optional Extended Reporting Period**

1.   For an additional premium, **we** will offer an Optional Extended Reporting Period endorsement, unless this policy is cancelled for non-payment of premium or Retention or for **your** failure to comply with policy provisions.

2.   If the Optional Extended Reporting Period endorsement is purchased, the Optional Extended Reporting Period begins with the end of the **policy period** and lasts for the period of time stated in the endorsement.

3.   Optional Extended Reporting Period coverage is available only if:

a.   the **first named insured** has paid all premiums and Retentions due for this policy at the time the **first named insured** requests an Optional Extended Reporting Period endorsement;

b.   **we** receive the **first named insured's** written request for it within thirty (30) days after the end of the **policy period**;

c.   the **first named insured** gives **us** written acceptance of **our** offer within fifteen (15) days of the day that **we** make **our** offer; and

d.   **we** receive payment in full for the Optional Extended Reporting Period within thirty (30) days of the **first named insured's** acceptance of **our** offer.

4.   Once in effect, the Optional Extended Reporting Period cannot be cancelled. **We** need not return any part of the premium paid for any reason whatsoever.

5.   Premium for the Optional Extended Reporting Period will be determined by taking into account the following:

a.   the exposures insured;

b.   previous types and amounts of insurance;

c.   Limits of Liability available under this policy for future payment of **wrongful acts** and **claim expenses**; and

d.   other related factors.

## Section VII – **Conditions**

A.   **Territory**

This policy applies to **wrongful acts**, **cyber extortion threats**, **network intrusions**, and **denial of service attacks** committed anywhere in the universe; except this policy does not apply when the **claim** is made, or the **first party expenses** are incurred, in a country against which the United States government has imposed trade sanctions, embargoes, or any similar regulations that prohibit the transaction of business with or within such countries at the time the **claim** is made or the **first party expenses** are incurred.

B.   **Currency**

The currency of this policy is United States of America dollars. If **damages**, **first party expenses**, or **claim expenses** are paid in a currency other than United States dollars, payment will be considered to have been made in United States dollars at the rate of exchange that was used for the payment. If no actual currency exchange was made, then the rate of exchange will be the rate published in The Wall Street Journal on the day following the date that payment was made.

C.  **Bankruptcy**

Bankruptcy or insolvency of **you** or of **your** estate will not relieve **us** of **our** obligations under this policy.

D.  **Cancellation**

1.  The **first named insured** may cancel this policy by mailing or delivering to **us** advance written notice of cancellation.

2.  **We** may cancel this policy by mailing to the **first named insured** written notice of cancellation at least:

    a.  ten (10) days before the cancellation is effective, if **we** cancel for non-payment of any premium when due; or

    b.  sixty (60) days before the cancellation is effective, if **we** cancel for any other reason.

3.  **We** will mail **our** notice to the address shown in the Declarations for the **named insured**.

4.  Notice of cancellation by **us** will state when the cancellation is effective. The **policy period** will end on that date.

5.  If this policy is cancelled, **we** will send the **first named insured** any premium refund due. If **we** cancel, the refund will be the pro-rata unearned premium. If the **first named insured** cancels, **we** will compute the return premium at ninety percent (90%) of the pro-rata unearned premium.

6.  Proof of mailing will be sufficient proof of notice.

7.  Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective. But payment or tender of unearned premium is not a condition of cancellation.

E.  **When We Do Not Renew**

1.  If **we** decide not to renew this policy, **we** will mail written notice of non-renewal to the **first named insured**. **We** will mail the notice at least sixty (60) days before the **policy period** ends.

2.  **We** will mail it to the address shown in the Declarations for the **named insured**. Proof of mailing will be sufficient proof of notice.

3.  If **we** offer to renew this policy on the same or different terms and the **first named insured** does not accept **our** offer during the current **policy period**, this policy will expire at the end of the **policy period**.

4.  If there is an inconsistency between the terms and conditions regarding the nonrenewal of this policy stated in a state amendatory endorsement attached to this policy and the terms and conditions of this **When We Do Not Renew** provision, **we** will apply those terms and conditions that are more favorable to **you**, where permitted by law.

F.  **Entire Agreement**

This policy contains all the agreements between **you** and **us** concerning this insurance.

G.  **Changes**

The **first named insured** is authorized by **you** to agree with **us** on all changes in the terms and conditions of this policy. This policy can only be changed by an endorsement that is issued by **us**.

H.  **Duties in the Event of Wrongful Act or Claim**

1.  The **named insured** must notify **us** in writing as soon as practicable of a **wrongful act** or circumstance that may result in a **claim** under this policy. This requirement applies only when the **wrongful act** is known to:

    a.  any person who is a **named insured**;

    b.   any partner, **executive officer,** or any individual in an equivalent position of a **named insured**, including but not limited to individuals that hold management positions similar to an **executive officer** for any **named insured** that does not have a charter, constitution, by-laws or any other similar governing document; or

    c.   any individual responsible for the insurance, legal, or financial matters of the **named insured** including but not limited to General Counsel, Risk Manager, or Insurance Manager of the **named insured**.

2.   If during the **policy period** any of **you** first become aware of a **wrongful act** to which this policy applies which may result in a **claim** under this policy and give **us** written notice within the **policy period** of:

    a.   the specific **wrongful act,** the date of the **wrongful act** and the name of the potential claimant;

    b.   the **damages** which have or may result from the **wrongful act**; and

    c.   the circumstances by which **you** first became aware of the **wrongful act**;

    then any **claim** first made arising out of the **wrongful act** will be deemed to have been made on the date **we** received written notice and therefore subject to items 3 and 4 below.

All notices or correspondence regarding **wrongful acts** or **claims** must be sent to the address(es) or facsimile(s) indicated by endorsement to this policy.

3.   If a **claim** is made against any of **you**, as soon as any **specified insured** knows of such a **claim**, **you** must:

    a.   immediately record the specifics of the **claim** and the date received;

    b.   immediately send **us** copies of all demands, notices, summonses and legal papers received in connection with the **claim**;

    c.   authorize **us** to obtain records and other information;

    d.   cooperate with **us** in the investigation, settlement, and defense of the **claim**; and

    e.   assist **us**, upon **our** request, in enforcing any right against any person or entity that may be liable to **you** or the claimant because of **damages** to which this policy may also apply.

4.   None of **you** will, except at **your** own cost, make a payment, assume any obligation, or incur any cost without **our** prior written consent.

I.  **Legal Action Against Us**

No person or entity has a right under this policy:

1.   to join **us** as a party or bring **us** into a suit asking for **damages** from **you**; or

2.   to sue **us** under this policy

unless all of its terms and conditions have been fully complied with.

A person or entity may sue **us** to recover on an agreed settlement or on a final judgment against **you** obtained after an actual trial or other binding adjudication. But **we** will not be liable for **claim expenses** or **damages** that are not payable under the terms and conditions of this policy or that are more than the applicable Limit of Liability.
An agreed settlement means a settlement that **we** agree to in writing.

J.  **Mergers, Consolidations or Acquisitions**

1.   If, after the Start Date of this policy shown in the Declarations, the **named insured**:

    a.   merges or consolidates with another entity; or

b.   acquires more than fifty percent (50%) of the assets of another entity,

and the **named insured** is the surviving entity, the entity merged or consolidated with or acquired by the **named insured** will be afforded coverage under this policy as a **named insured** for a period of ninety (90) days or until the expiration of this policy, whichever is less.

2.   **We** may endorse this policy to provide coverage beyond the period of time indicated in item 1 above if, within ninety (90) days of the merger, consolidation or acquisition transaction, **you** have:

   a.   provided **us** with full details of the transaction and any other additional underwriting information that **we** may require;

   b.   agreed to any amendment of the terms and conditions of this policy by endorsement issued by **us** relating to such transaction; and

   c.   agreed to and paid any additional premium for the endorsement related to such transaction.

3.   This policy does not apply to any **claim** or **first party expenses** arising from or involving an entity that is merged or consolidated with or acquired by the **named insured** for any **wrongful act**, **cyber extortion threat**, **network intrusion**, or **network outage** that was committed when the **first named insured** did not own directly or indirectly more than fifty percent (50%) of the issued and outstanding voting stock of the entity.

4.   The applicable retroactive date for an entity that was merged or consolidated with or acquired by the **named insured** will be the date of the merger, consolidation or acquisition by the **named insured**. **We** may endorse this policy to provide a different applicable retroactive date for the merged or consolidated with or acquired entity, if applicable information is provided to demonstrate similar coverage has been continuously maintained by the entity.

5.   If after the Start Date of this policy shown in the Declarations:

   a.   the **first named insured** merges or consolidates with another entity and the **named insured** is not the surviving entity; or

   b.   more than 50% of the securities representing the right to vote for the **first named insured's** board of directors or managers is acquired by another person or entity, group of persons or entities, or persons and entities acting in concert;

then coverage shall continue under this policy and any renewal or replacement hereof but only for **wrongful acts** occurring prior to any such transaction. The **first named insured** shall give us written notice and full, written details of such transaction as soon as practicable (but, in all cases, within ninety (90) days of such transaction). If any transaction described herein occurs, then **we** will not be obligated to offer any renewal or replacement of this policy.

K.   **Other Insurance and Payments Available to You**

Coverage under this policy will apply only in excess of all other:

1.   insurance, except for other insurance that is written specifically to apply in excess over this policy;

2.   bonds, self-insured retentions, deductibles, indemnifications; or

3.   similar agreements or payment options available to **you**

whether they are stated to be primary, pro rata, contributory, contingent or otherwise.

L.   **Payment of Premiums and Retention**

The **first named insured** must pay all premiums and Retentions when due. **We** will pay any return premiums to the **first named insured**.

M.   **Transfer of Rights of Recovery Against Others to Us**

**You** must do nothing to impair **your** rights to recover all or any part of any payment **we** have made under this policy, and those rights are transferred to **us**. At **our** request **you** will bring suit or transfer those rights to **us** and help **us** enforce them. Any recoveries will be paid first to reimburse the person or entity that paid the subrogation costs, then to **us** for the amount **we** have paid. Any amount that may remain will be paid to the **first named insured**.

N.   **Transfer of Your Rights and Duties Under This Policy**

**Your** rights and duties under this policy may not be transferred without **our** written consent except in the case of death or bankruptcy.

If **you** die or become bankrupt, **your** rights and duties will be transferred to **your** legal representative but only while acting within the scope of duties as **your** legal representative.

Until **your** legal representative is appointed, anyone having proper temporary custody of **your** property will have **your** rights and duties but only with respect to that property.

O.   **Representations and Statements**

By accepting this policy, **you** agree to all of the following:

1.   the representations and statements contained in the application for coverage and other information submitted to **us** in applying for this policy are accurate and complete; they were made to induce **our** reliance upon them;

2.   the representations and statements made to **us** in the application and other information submitted to **us** were made by the **named insured** on behalf of all of **you**; they are material to **our** decision to provide coverage; they are considered as incorporated in and constituting part of this policy;

3.   **we** have issued this policy in reliance upon those representations and statements;

4.   in the event the application or other information submitted to **us** contains misrepresentations or fails to state facts which affect **our** acceptance of the risk, the hazard assumed by **us**, the terms or conditions of the policy **we** offered or the premium **we** charged for this policy, **we** will not pay for any **claim expenses**, **damages**, or **first party expenses** relating to a **wrongful act**, **claim**, **cyber extortion threat**, **network intrusion**, or **network outage** under this policy; and

5.   if **you** report any **wrongful act**, **claim**, **cyber extortion threat**, **network intrusion**, or **network outage** knowing it, or any of the representations and statements regarding the **wrongful act**, **claim**, **cyber extortion threat**, **network intrusion**, or **network outage** to be false or fraudulent, this insurance will not make payments for the **wrongful act**, **claim**, **cyber extortion threat**, **network intrusion**, or **network outage**.

**ENDORSEMENT NO:**1

**This endorsement, effective 12:01 am,** 10/07/21                                                  forms part
**of policy number**      46 TE 0342080-21

**issued to:**          ADVAIYA SOLUTIONS INC

**by:**              HARTFORD FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDRESS FOR WRONGFUL ACT OR CLAIM NOTIFICATION OR CORRESPONDENCE ENDORSEMENT

**You** and **we** agree that:

Section VII – Conditions is changed to add the following:

All notices or correspondence regarding **wrongful acts** or **claims** must be sent to the attention of

      The Hartford
      Hartford Financial Products Claims Department

to one or more of the following:

| By Mail: | The Hartford |
| --- | --- |
| | Claims Department |
| | Hartford Financial Products |
| | 277 Park Avenue, 16th Floor |
| | New York, New York 10172 |

By email:        HFPClaims@thehartford.com

By facsimile:     (917) 464-6000

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**2

**This endorsement, effective 12:01 am,** 10/07/21                                                    **forms part**
**of policy number**      46 TE 0342080-21

**issued to:**          ADVAIYA SOLUTIONS INC

**by:**               HARTFORD FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# OTHER INSURANCE AND PAYMENTS AVAILABLE TO YOU – WHEN OTHER POLICY ISSUED BY US

This endorsement modifies insurance provided under:

**FailSafe<sup>sm</sup> Enterprise Liability Policy**

    **You** and **we** agree that:

        Section VII – **Conditions**, Subsection K. **Other Insurance and Payments Available to You** is amended to add:

            However, if any **claim** or **wrongful act** is insured under any other valid and collectible policy or policies issued by **us**, the **first named insured** may designate which policy is primary. If the **first named insured** does not designate a primary policy in that event, any **claim** or **wrongful act** will be applied proportionally to those applicable policies issued by **us**.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**3

**This endorsement, effective 12:01 am,** 10/07/21                                    forms part
**of policy number**      46 TE 0342080-21

**issued to:**         ADVAIYA SOLUTIONS INC

**by:**              HARTFORD FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ENTERPRISE SERVICES AND TECHNOLOGY SERVICES FOR A FEE MODIFICATION ENDORSEMENT

**You** and **we** agree that:

Section II – Definitions, changed to delete and replace the following definitions:

- **enterprise services** means the tangible and intangible work product and services **you** provide to others. **Enterprise services** include, but are not limited to, **technology services**. **Enterprise services** expressly do not include any violations of law, rule or regulations related to one's status as, or any performance or failure to perform services as an accountant, architect, civil or structural engineer, dental or medical health care professional, insurance agent or broker, lawyer, mortgage broker or banker, real estate agent or broker, or surveyor.

- **technology services** means the following services performed for others:

  1. consulting, analysis, design, installation, training, maintenance, support and repair of or on: software, wireless applications, firmware, shareware, networks, systems, hardware, devices or components;

  2. integration of systems;

  3. processing of, management of, mining or warehousing of data;

  4. administration, management, operation or hosting of: another party's systems, technology or computer facilities;

  5. website development; website hosting;

  6. internet access services; intranet, extranet or electronic information connectivity services; software application connectivity services;

  7. manufacture, sale, licensing, distribution, or marketing of: software, wireless applications, firmware, shareware, networks, systems, hardware, devices or components;

  8. design and development of: code, software or programming;

  9. providing software application: services, rental or leasing;

  10. screening, selection, recruitment or placement of candidates for temporary or permanent employment by others as information technology professionals;

  11. **telecommunication services**;

  12. **telecommunication products**; and

  13. web related software and connectivity services performed for others.

All other terms and conditions remain unchanged.

FS 00 H032 00 0718                                    FailSafe®                                    Page 1 of 2
© 2018, The Hartford

**ENDORSEMENT NO:** 3

Douglas Elliot, President

ENDORSEMENT NO:4

This endorsement, effective 12:01 am, 10/07/21                                 forms part
of policy number    46 TE 0342080-21

issued to:         ADVAIYA SOLUTIONS INC

by:                HARTFORD FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# DATA PRIVACY: LAWS, REGULATORY PROCEEDING AND WRONGFUL ACT REDEFINED

This endorsement modifies insurance provided under:

**FailSafe<sup>sm</sup> Enterprise Liability Policy**

**You** and **we** agree that:

Section II – **Definitions** is amended as follows:

1. The definition of **data privacy laws** in Section II. **DEFINITIONS** is amended to add the following:

   Data privacy laws also means the European Union General Data Protection Regulation ("GDPR").

2. Definitions, is amended to delete and replace the following:

   - **data privacy regulation proceeding** means a civil, administrative or regulatory proceeding against, or a civil investigation of, a **named insured** by a state's attorney general, the Federal Trade Commission, the Federal Communications Commission, or any other federal, state, local or foreign governmental entity in such entity's regulatory authority or capacity in connection with such proceeding, commenced by an investigative demand or similar request for information, or by a complaint or similar pleading, alleging violation of any **data privacy law** as a result of a **data privacy wrongful act** or a **network wrongful act**.
   - **data privacy wrongful act** means any act, error or omission by **you** or a **rogue employee** that results in:
     1. the improper collection, control, disclosure or use of **nonpublic personal information** that is within the care, custody or control of **you**, or any **third party service provider**;
     2. a violation by the **named insured** of a **data privacy law**; or
     3. the improper and unintentional disclosure of **third party corporate confidential information**.
   - **third party corporate confidential information** means third party corporate information provided to **you** and protected under a nondisclosure agreement or confidentiality provision of a contract entered into by the **named insured** with the owner of the third party corporate information, or for which the **named insured** is legally required to maintain in confidence.

All other terms and conditions remain unchanged.

**ENDORSEMENT NO:** 4

Douglas Elliot, President

**ENDORSEMENT NO:**5

**This endorsement, effective 12:01 am,** 10/07/21                                              forms part
**of policy number**      46 TE 0342080-21

**issued to:**          ADVAIYA SOLUTIONS INC

**by:**               HARTFORD FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ASBESTOS EXCLUSION

**You** and **we** agree that:

Section II – Definitions is changed to add the following:

**Asbestos hazard** means an exposure or threat of exposure to the actual or alleged properties of asbestos and includes the mere presence of asbestos in any form.

Section II – Definitions is changed to add the following:

-- **asbestos hazard**, including any:

1. threatened loss, injury or damage of any nature or kind to persons or property which would not have occurred in whole or in part but for the **asbestos hazard**;
2. request, demand or order to test for, monitor, clean up, remove, encapsulate, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of an **asbestos hazard**; or
3. testing for, monitoring, cleaning up, removing, encapsulating, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of an **asbestos hazard**.

All other terms and conditions remain unchanged.

Douglas Elliot, President

**ENDORSEMENT NO:**6

**This endorsement, effective 12:01 am,** 10/07/21                                    **forms part**
**of policy number**      46 TE 0342080-21

**issued to:**          ADVAIYA SOLUTIONS INC

**by:**              HARTFORD FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# UNSOLICITED SENDING OF INFORMATION EXCLUSION

Section III – **Exclusions**, A., of the policy is amended by the addition of the following:

--     Sending of information by fax, electronic mail (e-mail), or via any other means, where prohibited by law;

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**7

**This endorsement, effective 12:01 am,** 10/07/21                                                    **forms part**
**of policy number**      46 TE 0342080-21

**issued to:**          ADVAIYA SOLUTIONS INC

**by:**                 HARTFORD FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# RECALL AND REPLACEMENT COVERAGE

This endorsement modifies insurance provided under:

**FailSafe**<sup>sm</sup> **Enterprise Liability Policy**

**You** and **we** agree that:

Section II – **Definitions**, definition of **damages,** 4. under **"damages** do not include", is deleted and replaced with the following:

4.   cost or expense to recall, upgrade, replace, repair, correct, complete or re-perform **enterprise services**, in whole or part, by:

   a.   any of **you**; or

   b.   another party on **your** behalf; or

   c.   the party to whom the **enterprise services** were provided, unless **you** were not given the opportunity to cure or if **you** were given the opportunity, after exercising **your** best efforts at **your** own expense, **you** were unable to successfully or satisfactorily recall, upgrade, replace, repair, correct, complete or re-perform **enterprise services.** Whether **you** were given the opportunity to cure and whether **you** exercised **your** best efforts shall be determined by **us** in **our** sole discretion, such discretion not to be exercised unreasonably.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**8

**This endorsement, effective 12:01 am,** 10/07/21                                      **forms part**
**of policy number**    46 TE 0342080-21

**issued to:**        ADVAIYA SOLUTIONS INC

**by:**            HARTFORD FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WAIVER OF RIGHTS OF RECOVERY
# PER CONTRACT REQUIREMENT

**You** and **we** agree that:

Section VII – Conditions, the subsection entitled **Transfer of Rights of Recovery Against Others to Us**, is deleted and replaced with the following:

**Transfer of Rights of Recovery Against Others to Us**

**You** must do nothing to impair **your** rights to recover all or any part of any payment **we** have made under this policy, and those rights are transferred to **us**. At **our** request **you** will bring suit or transfer those rights to **us** and help **us** enforce them. Any recoveries will be paid first to reimburse the person or entity that paid the subrogation costs, then to **us** for the amount **we** have paid. Any amount that may remain will be paid to the **first named insured**.

However, solely as respects to **enterprise service** performed by **you** for a client that requires, by written contract, the **named insured** to waive their right of recovery against such client, **we** will waive any right of recovery **we** may have against such client for amounts paid by **us**.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**9

**This endorsement, effective 12:01 am,** 10/07/21                                                    **forms part**
**of policy number**      46 TE 0342080-21

**issued to:**          ADVAIYA SOLUTIONS INC

**by:**              HARTFORD FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# INDEPENDENT CONTRACTOR, TEMPORARY, OR LEASED PERSONNEL ENDORSEMENT

**You** and **we** agree that:

Section II – Definitions is amended as follows:

The definition of **you**, item 4, is deleted and replaced with the following:

- Any agent, independent contractor, temporary, or leased personnel, but only while acting within the scope of his or her **contract worker agreement** with the **named insured**.

The definition of **contract worker agreement** is deleted and replaced with the following:

- **contract worker agreement** means a signed agreement between the **named insured** and an agent, independent contractor, or temporary or leased personnel when the agreement provides that:

  1. the agent, independent contractor, or temporary or leased personnel will provide specific **enterprise services** on behalf of the **named insured**;

  2. the **named insured** will indemnify the agent, independent contractor, or temporary or leased personnel for those **enterprise services**; and

  3. the agreement is made before any **wrongful act** that may give rise to a **claim**.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**10

**This endorsement, effective 12:01 am,** 10/07/21                                    forms part
**of policy number**      46 TE 0342080-21

**issued to:**          ADVAIYA SOLUTIONS INC

**by:**               HARTFORD FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# HAMMER CLAUSE MODIFICATION ENDORSEMENT

**You** and **we** agree that:

Section I – Coverage, subsection B, item 3.a. is deleted and replaced with the following:

a.  **You** will not settle any **claim** without **our** prior written consent, even if the **claim** is less than the amount of the Retention. **We** have the right to settle all **claims**, wherever made, unless **we** receive a written objection from the **first named insured** before **we** agree to a settlement. The **first named insured** will be notified before **we** agree to a settlement. If the **first named insured** objects to a settlement recommended by **us** and acceptable to the claimant, then **our** duty to pay will be limited to:

(1)  the amount of **damages** for which the **claim** could have been settled; plus

(2)  all **claim expenses** incurred and paid or payable by **us** or the **first named insured** at the time **we** made **our** recommendation; plus

(3)  80 percent (80%) of all covered **damages** and **claim expenses** incurred and paid or payable by **us** or the **first named insured** after the time **we** made **our** recommendation.

If the total of these amounts falls within **your** Retention, **we** will have no duty to pay **damages** and **claim expenses** on that **claim**.

In no event will **we** be obligated to pay more than the remaining applicable Limit of Liability determined under Section V – Limits of Liability and Retention.

In **claims** where the **first named insured** has objected to a settlement recommended by **us**, **we** have the right to stop defending and paying **claim expenses** upon tendering control of the defense to **you**.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

ENDORSEMENT NO:11

This endorsement, effective 12:01 am, 10/07/21                                                forms part
of policy number    46 TE 0342080-21

issued to:        ADVAIYA SOLUTIONS INC

by:               HARTFORD FIRE INSURANCE CO.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW SUBSIDIARY, MERGER, CONSOLIDATION OR ACQUISITION - SPECIALTY RISKS ENDORSEMENT

I.  Section II – Definitions, subsection 1 within the definition of **Subsidiary**, is deleted and replaced with the following:

1.  **Subsidiary** also includes any corporation which becomes a **subsidiary** during the **policy period**, provided that as soon as practical, **you** have:

    a.  provided **us** with full details of the new **subsidiary** including a completed and signed **subsidiary** application any other underwriting information **we** may require;

    b.  agreed to and paid any additional premium related to the **subsidiary**, if projected gross annual revenues of the new **subsidiary** are equal to or greater than 35 percent (35%) of the projected gross annual revenues for all of **you** on the Start Date of this policy; and

    c.  agreed to any change in the terms and conditions of this policy required by **us** relating to the new **subsidiary**.

II. Section VII – Conditions, subsection 2 within J. **Mergers, Consolidations or Acquisitions**, is deleted and replaced with the following:

2.  **We** may endorse this policy to provide coverage beyond the period of time indicated in item 1. above if, as soon as practical after the merger, consolidation or acquisition transaction, **you** have:

    a.  provided **us** with full details of the transaction and any other additional underwriting information that **we** may require;

    b.  agreed to any amendment of the terms and conditions of this policy by endorsement issued by **us** relating to such transaction; and

    c.  agreed to and paid any additional premium for the endorsement related to such transaction, if, as a result of the transaction, projected gross annual revenues for all of **you** increases 35 percent (35%) or more over the projected gross annual revenues on the Start Date of this policy.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**12

**This endorsement, effective 12:01 am,** 10/07/21                                    forms part
**of policy number**      46 TE 0342080-21

**issued to:**        ADVAIYA SOLUTIONS INC

**by:**            HARTFORD FIRE INSURANCE CO.
## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
# FIRST PARTY EXPENSE ENDORSEMENT WITH CYBER BREACH COACH NO RETENTION

**You** and **we** agree that:

The Limits of Liability stated in item 4 and the Retention Each **Wrongful Act** stated in item 5 of the Declarations Page are amended to add the following Limits of Insurance, Retentions, Waiting Periods, and Period of Restorations:

| First Party Aggregate Limit: | $100,000 | | |
|---|---|---|---|
| First Party Expense | First Party Sublimits | First Party Retention | First Party Waiting Period |
| Crisis Management Expense | $100,000 | $5,000 | |
| Cyber Investigation Expense | $100,000 | $5,000 | |
| Data Privacy Regulatory Expense | $100,000 | $5,000 | |
| Notification and Identity Protection Expense | $100,000 | $5,000 | |
| PCI Expense | $N/A | $N/A | |
| Cyber Extortion Expense | $100,000 | $5,000 | |
| Business Interruption Loss | $N/A | $N/A | 0 hrs |
| Dependent Business Interruption Loss | $N/A | $N/A | 0 hrs |
| Data Restoration Expense | $N/A | $N/A | |
| | | | |
| Period of Restoration | | | |
| Business Interruption Loss | 0 days | | |
| Dependent Business Interruption Loss | 0 days | | |

The above First Party Aggregate Limit and First Party Sublimits are all sublimits of insurance that are part of, and not in addition to, the Aggregate Limit stated in item 4 of the Declarations.

If the space for any of the above First Party Sublimits is left blank or indicated as "N/A", then there is no coverage for that First Party Expense. If the space for a First Party Retention is left blank or indicated as "N/A", the applicable First Party Retention will be the same as the Retention Each **Wrongful Act** stated in item 5 of the Declarations. If the space for a First Party Waiting Period is left blank, the applicable Waiting Period will be 12 hours. If the space for a Period of Restoration is left blank, the applicable Period of Restoration will be 30 days.

Section I – Coverage, Subsection A. Insuring Agreement is amended to add:

**First party expenses** elected below are subject to the applicable First Party Sublimit, the First Party Aggregate Limit and the Aggregate Limit stated in Item 4 of the Declarations, and are in excess of the applicable First Party Retention and Waiting Period. Where applicable, they are also subject to a **period of restoration**. The following **first party expenses** are provided if:

(i)   designated with an 'X' hereon,

(ii)  a limit is specified for the applicable First Party Sublimit stated on page 1 of this endorsement, and

(iii)  **you** receive **our** prior written consent for such **first party expenses**:

☒ Crisis Management Expenses Coverage
**We** will reimburse the **named insured** for **crisis management expenses** that directly result from a **data privacy wrongful act** or **network intrusion**.

☒ Cyber Investigation Expenses Coverage
**We** will reimburse the **named insured** for **cyber investigation expenses** that directly result from a **data privacy wrongful act** or **network intrusion**.

☒ Data Privacy Regulatory Expenses Coverage
**We** will reimburse the **named insured** for **data privacy regulatory expenses** that directly result from a **data privacy wrongful act**.

☒ Notification and Identity Protection Expenses Coverage
**We** will reimburse the **named insured** for **notification and identity protection expenses** that directly result from a **data privacy wrongful act**.

☐ PCI Expenses Coverage
**We** will reimburse the **named insured** for **pci expenses** that the **named insured** becomes legally obligated to pay as a direct result of a **data privacy wrongful act** or **network wrongful act**.

☒ Cyber Extortion Expenses Coverage
**We** will reimburse the **named insured** for **cyber extortion expenses** that directly result from a **cyber extortion threat** communicated to the **named insured** by a person or group, who is not insured under this policy.

☐ Business Interruption Loss Coverage
**We** will reimburse the **named insured** amounts which the **named insured** incurs during the **period of restoration** as **business interruption loss** after the expiration of the Waiting Period, and **extra expense**, directly resulting from the **named insured's network outage**.

☐ Dependent Business Interruption Loss Coverage
**We** will reimburse the **named insured** amounts which the **named insured** incurs during the **period of restoration** as **dependent business interruption loss** after the expiration of the Waiting Period, and **extra expense**, directly resulting from a **third party service provider's network outage**.

☐ Data Restoration Expense Coverage
**We** will reimburse the **named insured** for **data restoration expenses**, as a direct result of the **network intrusion**.

**ENDORSEMENT NO:** 12

Section I – Coverage, Subsection C. When We Insure is amended to add:

The coverage for **first party expenses** offered under this policy apply only if the following applicable terms are met:

1. the **wrongful act** is first discovered by a **specified insured** during the **policy period** and is reported to **us** in writing as soon as practicable from the discovery of the **wrongful act** by a **specified insured** but no later than ninety (90) days after the expiration of the **policy period**;

2. the **cyber extortion threat** or **network outage** first occurs during the **policy period** and is reported to **us** in writing by a **specified insured** as soon as practicable from the date the **cyber extortion threat** or **network outage** occurs but no later than ninety (90) days after the expiration of the **policy period**;

3. the **network intrusion** is discovered a **specified insured** during the **policy period** and is reported to **us** in writing by **you** as soon as practicable from the date the **network intrusion** is discovered but no later than ninety (90) days after the expiration of the **policy period**; and

4. prior to surrendering **cyber extortion payments** or the surrendering of property or other consideration as payment, the **named insured** conducts a reasonable investigation and reasonably determines that the threat is technologically credible.

There is no coverage under this endorsement arising out of any **data privacy wrongful acts**, **cyber extortion threats**, **network intrusions, network outages,** or **network wrongful acts** occurring during any Extended Reporting Period offered under this policy. No Extended Reporting Period available to any of **you** shall apply to any **first party expenses**.

None of **you** will, except at **your** own cost, make a payment, assume any obligation, or incur any cost without **our** consent, which will not be unreasonably withheld. The **named insured** shall obtain prior written approval from **us** prior to incurring **first party expenses**. However, **you** will not need prior written approval for the retention of any service provider on the panel of **cyber first responders**.

All notices or correspondences regarding **wrongful acts**, **cyber extortion threats, network intrusions,** or **network outages,** must be sent to the address (es) or facsimile(s) indicated by endorsement to this policy.

If a **wrongful act**, **cyber extortion threat, network intrusion,** or **network outage** occurs, **you** must:

1. immediately record the specifics of the **wrongful act**, **cyber extortion threat**, **network intrusion**, or **network outage,** and the date it occurred;

2. immediately send **us** copies of all applicable demands, notices, summonses and legal papers received in connection with the **wrongful act**, **cyber extortion threat**, **network intrusion**, or **network outage**;

3. authorize **us** to obtain records and other information;

4. cooperate with **us** in the investigation of the **wrongful act**, **cyber extortion threat**, **network intrusion**, or **network outage**; and

5. assist **us**, upon **our** request, in enforcing any right against any person or entity that may be liable to **you** for the **first party expenses** that may be applicable to this coverage endorsement.

Section II – Definitions, is amended in the following manner:

The following definitions in Section II – Definitions are deleted and replaced with the following:

■ **business interruption loss** means the sum of **actual income loss** and the **named insured's** continuing fixed operating and payroll expenses, resulting from a **network outage** of a **named insured's computer system**.

**business interruption loss** does not include any

1. contractual liability or the value of, or associated with, any cancelled contract, including but not limited to any sums due pursuant to a contractual provision for liquidated damages, agreed penalties, or similar remedy;

2. costs or expenses incurred to update, replace, restore, or improve the **computer system**;

3. costs or expenses incurred to identify or remediate vulnerabilities or errors in the **computer system**;

Fail**Safe**<sup>®</sup>
© 2018, The Hartford

4. **damages**;

5. **claim expenses**;

6. other **first party expenses**; or

7. amounts that are uninsurable pursuant to applicable law.

- **crisis management expenses** means reasonable and necessary fees and expenses:

  1. charged by a **crisis management firm** or **cyber breach coach** in the performance of **crisis management services**; and

  2. for printing, advertising, mailing of materials, or travel by an **executive officer**, partner, owner, employee, agent of the **named insured**, or the **crisis management firm** as a direct response to a **data privacy wrongful act** or **network intrusion**.

  **crisis management expenses** do not include any of **your** overhead expenses or any salaries, wages, fees, or benefits of any **you**, nor do they include any amounts that are uninsurable pursuant to applicable law.

- **crisis management firm** means any public relations or law firm hired or appointed by **us** or by **you** to perform **crisis management services** in connection with a **data privacy wrongful act** or **network intrusion**.

- **crisis management services** means those services performed by a **crisis management firm** or **cyber breach coach** to minimize potential harm to the **named insured** arising from a **data privacy wrongful act** or **network intrusion**, including:

  1. maintaining and restoring public confidence in the **named insured**;

  2. providing advice to the **named insured** in connection with such **data privacy wrongful act** or **network intrusion**;

  3. determining the **named insured's** legal obligations under **data privacy laws**;

  4. providing necessary legal services to the **named insured** in responding to a **data privacy wrongful act** or **network intrusion**; and

  5. communicating prior to a **claim** or **data privacy regulatory proceeding** with regulators, consumers, and clients regarding a **data privacy wrongful act** or **network intrusion**.

- **cyber extortion payments** means any actual, reasonable, and necessary monetary amounts, including amounts in bitcoin and cryptocurrencies, at the actual rate of exchange at the date and time of the transaction in the equivalent of United States of America dollars, paid by the **named insured** with **our** consent, not to be unreasonably withheld, to a party who is not insured under this policy and whom the **named insured** reasonably believes to be responsible for the **cyber extortion threat** if insurable pursuant to applicable law. **Cyber extortion payments** will also include any reasonable and necessary expenses incurred in order to facilitate, mitigate or negotiate any actual amount paid in response to the **cyber extortion threat**.

- **data restoration expenses** means the actual, reasonable, and necessary expenses incurred by **you** to restore, replace or recover a computer program, software, application or other electronic data that is altered, destroyed, stolen, impaired or erased as a result of a **network intrusion**.

  If **you** determine that such computer program, software, application or other electronic data cannot be reasonably restored, replaced or recovered, then **data restoration expenses** means only the reasonable and necessary costs incurred by **you** to reach this determination.

ENDORSEMENT NO: 12

At **our** sole discretion, and subject to the **our** prior written consent which will not be unreasonably withheld, **we** may agree to reimburse the **named insured** for **internal expense** incurred to restore, remediate, replace, or recover a computer program, software, application or other electronic data.

**data restoration expenses** do not include costs or expenses incurred to:

1.  identify or remediate any errors or vulnerabilities or to update, restore, replace, upgrade, maintain, or improve any **computer system**;

2.  duplicate the research that led to the development of the **named insured's** computer program, software, application, other electronic data or any proprietary or confidential information or intellectual property; or

3.  develop or purchase any computer program, software, application or other electronic data.

Nor do **data restoration expenses** include:

a.  the economic or market value of any **computer system**, computer program, software, application or other electronic data;

b.  any amounts that are uninsurable pursuant to applicable law; or

c.  any of **your** overhead expenses or any salaries, wages, fees, or benefits of any **you**.

■  **period of restoration** means the period of time that begins with the date and time of the **network outage** and ends on the date and time the **named insured's** income is or could have been restored to substantially the level that would have existed in the absence of the **network outage**. The foregoing notwithstanding, in no event shall the **period of restoration** exceed the number of days set forth in the Declarations.

The definition of **cyber extortion threat** in Section II. Definitions is amended to delete item 2. of the definition and replace with the following:

alter, damage, encrypt, render inaccessible, or continue to render inaccessible any computer program, software or electronic data that is stored within the **computer system** including, but not limited to threats involving ransomware;

Section II – Definitions is amended to add the following definitions:

■  **breach coach services** means the services described in sub-parts 3, 4, and 5 of the definition of "**crisis management services"** that are provided by a **cyber breach coach.**

■  **cyber breach coach** means a pre-approved law firm on the list of **cyber first responders** at the time notice of a **data privacy wrongful act** or **network intrusion** discovered by a **specified insured** during the **policy period** is tendered to **us** for coverage under **crisis management expense** coverage.

■  **cyber first responder** means a service provider approved by **us** to provide services related to the **first party expenses** in this Endorsement, and maintained in a periodically updated written list on The Hartford Cyber Center portal available at the following link: https://cybercenter.thehartford.com

■  **dependent business interruption loss** means the sum of **actual income loss** and the **named insured's** continuing fixed operating and payroll expenses, resulting from a **network outage** of a **third party service provider's computer system**.

**Dependent business interruption loss** does not include any:

1.  contractual liability or the value of, or associated with, any cancelled contract, including but not limited to any sums due pursuant to a contractual provision for liquidated damages, agreed penalties, or similar remedy;

2.  costs or expenses incurred to update, replace, restore, or improve the **computer system**;

3.  costs or expenses incurred to identify or remediate vulnerabilities or errors in the **computer system**;

4.  **damages**;

5.  **claim expenses**;

6.  other **first party expenses**; or

7.  amounts that are uninsurable pursuant to applicable law.

- **internal expense** means a **named insured's** overhead expenses, or any salaries, wages, or fees of its employees incurred as a result of a **data privacy wrongful act** or **network intrusion** of a **named insured's computer system** when the **named insured** undertakes all or a portion of the work to restore, replace or recover a computer program, software, application or other electronic data instead of hiring an external vendor. Provided, however, that, as a condition precedent to coverage, **internal expense** will only be recognized if: 1) the **named insured** performs such task(s) under the advice of a **cyber first responder**, 2) such expenses are specifically allocable to the **data privacy wrongful act** or **network intrusion** response, and 3) the **named insured** submits activity based accounting records in full support of such expense allocation.

The definition of **first party expenses** in Section II. Definitions is amended to add the following:

> **first party expenses** also means **dependent business interruption loss** and **internal expense**.

Section III – Exclusions, is amended in the following manner:

Subsection A, item 2. is amended to add the following:

> This exclusion will also not apply to **first party expenses** covered hereunder as a result of the loss of the **named insured's** leased or owned computer hardware including mobile, networked, and data storage computing equipment;

Subsection A., item 11. is amended to add the following:

> This exclusion will also not apply to **first party expenses** covered hereunder that the **named insured** pays as a direct result of a **data privacy wrongful act**;

Section V – Limits of Liability and Retention, Subsection A. Limits of Liability is amended to add:

3.  First Party Aggregate Limit

Subject to A.2 of Section V – Limits of Liability and Retention, the First Party Aggregate Limit indicated in this endorsement is the most **we** will pay for the total of all **first party expenses** that apply to this policy, regardless of the number of:

a.  **named insureds** this policy covers; or

b.  **wrongful acts**, **cyber extortion threats**, **network intrusions**, or **network outages** that occur.

The First Party Aggregate Limit is a sublimit of insurance that is part of, and not in addition to, the Aggregate Limit stated in item 4 of the Declarations.

4.  First Party Sublimits

Subject to A.2 and A.3 of Section V – Limits of Liability and Retention, the First Party Sublimit stated for each **first party expense** indicated in this endorsement is the most we will pay for each applicable **first party expense**, regardless of the number of:

ENDORSEMENT NO: 12

a.  **named insureds** this policy covers; or

b.  **wrongful acts**, **cyber extortion threats**, **network intrusions**, or **network outages** that occur.

The First Party Sublimits are all sublimits of insurance that are part of, and not in addition to, the First Party Aggregate Limit referenced in item 3 above and also the Aggregate Limit stated in item 4 of the Declarations.

Further, any payment of **Breach Coach Services** by the Insurer will reduce the applicable Limits of Liability.

Section V – Limits of Liability and Retention is amended to add:

**First Party Retentions**

The First Party Retention stated for each **first party expense** indicated in this endorsement is the amount of money the **named insured** must pay for each applicable covered **first party expense** arising from a **wrongful act**, **cyber extortion threat**, **network intrusion**, or **network outage** before this policy will begin to pay. **You** may not insure a First Party Retention. A First Party Retention will not be reduced by the payment of any deductible amount or any amount retained by any of **you** under any other policy of insurance; and a First Party Retention will not be reduced by any payment made on **your** behalf by another person or entity. A First Party Retention will not reduce the applicable First Party Sublimit or the First Party Aggregate Limit. However, no retention will apply to the **Breach Coach Services**.

If multiple **first party expenses** arise from the same **wrongful act, network intrusion**, **cyber extortion threat** or **network outage,** the retention for each applicable **first party expense** will be applied separately. However, with respect to all **first party expenses** other than Business Interruption Loss and Dependent Business Interruption Loss, the sum of such First Party Retentions shall not exceed the largest such applicable Retention.

With respect to the Business Interruption Loss and Dependent Business Interruption Loss coverages of this policy, the applicable Waiting Periods will only apply to **business interruption loss** and **dependent business interruption loss**, but not to **extra expense**. The Business Interruption Loss and Dependent Business Interruption Loss Retentions will apply only to **extra expense**.

In no event shall the sum of all applicable Retentions triggered by the same **wrongful act**, **network intrusion**, **cyber extortion threat** or **network outage** exceed the largest applicable Retention.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**13

**This endorsement, effective 12:01 am,** 10/07/21                                                    **forms part**
**of policy number**    46 TE 0342080-21

**issued to:**         ADVAIYA SOLUTIONS INC

**by:**               HARTFORD FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WAR EXCLUSION
# WITH CYBER TERRORISM CARVE-BACK

This endorsement modifies insurance provided under:

**FailSafe**sm **Enterprise Liability Policy**

**You** and **we** agree that:

Section III - **Exclusions**, Subsection A is amended to add the following:

This insurance does not apply to damages, first party expense or claim expenses, and we do not defend any of **you**, for any **wrongful act** or **claim** arising indirectly or directly out of:

1. war, including undeclared or civil war; or

2. warlike action, including action in hindering or defending against an actual, threatened or expected attack, by a military force, any government, sovereign or other authority using military personnel or other agents; or

3. insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these;

Provided, however, that this exclusion will not apply to any act of **cyber terrorism**.

Section II – **Definitions** is amended to add the following:

■ **cyber terrorism** means the premeditated use, or threatened use, of disruptive activities, including a **cyber extortion threat** against **your computer systems**, by an individual or group of individuals, whether acting alone or on behalf of or in connection with any organization or government, with the intent to demand a **cyber extortion payment**, cause a **network intrusion**, or violate **data privacy laws**, in furtherance of stated social, ideological, religious, economic or political objectives, or to intimidate the insured in furtherance of such objectives.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:**14

**This endorsement, effective 12:01 am,** 10/07/21                                    forms part
**of policy number**       46 TE 0342080-21

**issued to:**        ADVAIYA SOLUTIONS INC

**by:**          HARTFORD FIRE INSURANCE CO.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# WASHINGTON CHANGES

I.  **Section VII – Conditions**, subsection **M Transfer of Rights of Recovery Against Others to** Us is deleted and replaced with the following:

   M.   **Transfer of Rights of Recovery Against Others to Us**

   **You** must do nothing to impair **your** rights to recover all or any part of any payment **we** have made under this policy, and those rights are transferred to **us**. At **our** request **you** will bring suit or transfer those rights to **us** and help **us** enforce them. Any recoveries will be paid first to the **first named insured** to make the **first named insured** whole, without any double recovery. Any amount that may remain will be paid to **us** for the amount **we** have paid for fees and costs to make the recovery, **claim expenses**, and **damages**.

II.  **Section VII – Conditions**, subsection **O. Representations and Statements** is deleted and replaced with the following:

   O.   **Representations and Statements**

   By accepting this policy, **you** agree to all of the following:

   1.   the representations and statements contained in the application for coverage and other information submitted to **us** in applying for this policy are accurate and complete; they were made to induce **our** reliance upon them;

   2.   the representations and statements made to **us** in the application and other information submitted to **us** were made by the **named insured** on behalf of all of **you**; they are material to **our** decision to provide coverage; they are considered as incorporated in and constituting part of this policy;

   3.   **we** have issued this policy in reliance upon those representations and statements;

   4.   in the event the application or other information submitted to **us** contains intentional misrepresentations, intentionally conceals a material fact or circumstance relating to this Policy, or fails to state facts which affect **our** acceptance of the risk, the hazard assumed by **us**, the terms or conditions of the policy **we** offered or the premium **we** charged for this policy, **we** will not pay for any **claim expenses**, **damages**, or **first party expenses** relating to a **wrongful act**, **claim**, **cyber extortion threat**, **network intrusion**, or **network outage** under this policy; and

   5.   if **you** report any **wrongful act**, **claim**, **cyber extortion threat**, **network intrusion**, or **network outage** knowing it, or any of the representations and statements regarding the **wrongful act**, **claim**, **cyber extortion threat**, **network intrusion**, or **network outage** to be false or fraudulent, this insurance will not make payments for the **wrongful act**, **claim**, **cyber extortion threat**, **network intrusion**, or **network outage**.

All other terms and conditions remain unchanged.

*Douglas Elliot*

Douglas Elliot, President

**ENDORSEMENT NO:** 15

This endorsement, effective 12:01 am, 10/07/21                                             forms part
of policy number        46 TE 0342080-21

issued to:          ADVAIYA SOLUTIONS INC

by:                 HARTFORD FIRE INSURANCE CO.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## WASHINGTON CANCELLATION AND NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "Insurer" means the insurance company which issued this policy; and 2) "Insured" means the Name of Insured, Name of Company, Name of Partnership, Parent Company, Name of Insured Plan or Trust, Name of Insured Entity, Named Entity, Named Real Estate Investment Trust(s), Name of Sponsor Company or Insured stated in ITEM A or ITEM 1 of the Declarations Page.

The Cancellation provision of the Policy is deleted and replaced by the following:

<u>NOTICE OF CANCELLATION</u>

A.    The Insured may cancel this Policy at any time. Such cancellation may be done by an authorized representative of the Insured who understands that a request to cancel this Policy is binding on both parties. The Insurer will use its reasonable best efforts to confirm the foregoing and may require documentation thereof.

    1.    The Insured may provide notice before the effective date of the cancellation using one of these methods:

        a.    Written notice of cancellation to the Insurer or producer by mail, fax or e-mail;
        b.    Surrender of the policy or binder to the Insurer or producer; or
        c.    Verbal notice to the Insurer or producer.

    2.    If the Insurer receives notice of cancellation from the Insured, it will accept and promptly cancel the policy or any binder issued as evidence of coverage effective the later of:

        a.    The date notice is received; or
        b.    The date the Insured requests cancellation.

    3.    If an Insured provides verbal notice of cancellation to the Insurer, the Insurer may require the Insured to provide written confirmation of cancellation, but may not impose a waiting period for cancellation by requiring written confirmation from the Insured.

B.    The Insurer may cancel this Policy by mailing or delivering to the Insured and any party shown by the Policy to have an interest in any Loss which occurs thereunder, and the agent or broker, written Notice of Cancellation, including the actual reason for the cancellation, to the last known mailing addresses, at least:

    1.    ten (10) days before the effective date of cancellation if the Insurer cancels for nonpayment of premium; or
    2.    forty-five (45) days before the effective date of cancellation if the Insurer cancels for any other reason.

**ENDORSEMENT NO:** 15

C.  Notice of Cancellation will state the effective date of cancellation. The Policy Period will end on that date.

D.  If cancelled by the Insured, the Insurer shall retain the customary short rate proportion of the premium hereon, except as otherwise provided in this Policy. If the Insurer cancels this Policy, the Insurer shall retain the pro rata proportion of the premium hereon.

E.  If notice is mailed, proof of mailing will be sufficient proof of notice.

F.  Notice of Cancellation must also be so delivered or mailed to each mortgagee, pledgee, or other person shown by the policy to have an interest in any loss which may occur thereunder.

The following provision is added:

NOTICE OF NONRENEWAL

A.  The Insurer may elect not to renew this Policy by mailing or delivering written Notice of Nonrenewal, stating the reasons for nonrenewal, to the Insured and the Insured's agent or broker, at their last mailing addresses known to the Insurer. The Insurer will also mail to any mortgage holder, pledgee or other person shown in this Policy to have an interest in any Loss which may occur under this Policy, at their last mailing address known to the Insurer, written Notice of Nonrenewal.

B.  The Insurer will mail or deliver these notices at least forty-five (45) days before the:

1.  Expiration of the Policy; or
2.  Anniversary date of this Policy if this Policy has been written for a term of more than one year.

C.  The Insurer will renew this Policy unless:

1.  The Insured fails to pay the renewal premium after the Insurer has expressed its willingness to renew, including a statement of the renewal premium, to the Insured and the Insured 's insurance agent or broker, at least 20 days before the expiration date; or
2.  Other coverage acceptable to the Insured has been procured prior to the expiration date of the Policy.

All other terms and conditions remain unchanged.

Douglas Elliot, President

# Fee Disclosure Notice –
# State of Washington

A service fee of $6.00 is charged for each installment when your premium is paid in installments, whether paid by check or by electronic funds transfer. If you have more than one policy with The Hartford billing on an account, only one service fee will be charged per installment. The service fee will be added to the premium amount shown on your premium billing statement. By paying the Current Balance on your Insurance Bill in full, you can avoid future service fees associated with administering your payment plan.



# U.S. DEPARTMENT OF THE TREASURY, OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by the United States. **Please read this Notice carefully**.

The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States. OFAC acts under Presidential national emergency powers, as well as authority granted by specific legislation, to impose controls on transactions and freeze assets under U.S. jurisdiction. OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. Collectively, such individuals and companies are called "Specially Designated Nationals and Blocked Persons" or "SDNs". Their assets are blocked and U.S. persons are generally prohibited from dealing with them. This list can be located on OFAC's web site at — http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is an SDN, as identified by OFAC, the policy is a blocked contract and all dealings with it must involve OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC.

# DISCLOSURE FORM

# CLAIMS-MADE POLICY
# IMPORTANT NOTICE TO POLICYHOLDER

**THIS DISCLOSURE FORM IS NOT YOUR POLICY. IT DESCRIBES SOME OF THE MAJOR FEATURES OF OUR CLAIMS-MADE POLICY FORM. READ YOUR POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES, AND WHAT IS AND IS NOT COVERED. ONLY THE PROVISIONS OF YOUR POLICY DETERMINE THE SCOPE OF YOUR INSURANCE PROTECTION.**

## DEFINITIONS

1. **claims-made policy** means an insurance policy that provides coverage only if a **claim** is made during the **policy period** or any applicable **extended reporting period**. A **claim** made during the **policy period** could be charged against a **claims-made policy** even if the event (the "**wrongful act**") causing the **claim** occurred many years prior to the **policy period**. If a **claims-made policy** has a **retroactive date**, an event prior to that date is not covered.

2. **extended reporting period** means a period allowing for making and reporting **claims** after expiration of a **claims-made policy**. This is also known as a "tail."

3. **occurrence policy** means an insurance policy that provides liability coverage only for an event that occurs during the policy term, regardless of when the **claim** is actually made. A **claim** made in the current policy year could be charged against a prior policy year, or may not be covered, if it arises from an event prior to the effective date.

4. **retroactive date** means the date on a **claims-made policy** that denotes the commencement date of coverage for events under the policy.

## YOUR POLICY

**Your** policy is a **claims-made policy**. It provides coverage only when the event occurs on or after the policy **retroactive date** (if any) shown on **your** policy and before the end of the **policy period**, and when the **claim** is first made against **you** and reported in writing to **your** insurer as soon as practicable in accordance with the terms of the policy. Upon termination of **your claims-made policy**, an **extended reporting period** option is available from **your** insurer.

There is no difference in the kind of event covered by **occurrence policies** or **claims-made policies**. **Claims** for **damages** may be assigned to different **policy periods**, depending on which type of policy **you** have.

## PRINCIPAL BENEFITS

This policy provides coverage for **damages** and **claim expenses** in excess of the retention because of a **claim** caused by a **wrongful act** in **your** performance of **enterprise services**, up to the maximum dollar limit specified in the policy.

The principal benefits and coverages are explained in detail in **your claims-made policy**. Please read it carefully and consult **your** insurance producer about any questions **you** might have.

## EXCEPTIONS, REDUCTIONS AND LIMITATIONS

**Your claims-made policy** contains certain exceptions, reductions and limitations. Please read them carefully and consult **your** insurance producer about any questions **you** might have.

## RENEWALS AND EXTENDED REPORTING PERIODS

**Your claims-made policy** has some unique features relating to renewal, **extended reporting periods** and coverage for events with long periods of potential liability exposure.

If there is a **retroactive date** in **your** policy, no event prior to that date will be covered under the policy even if a **claim** is made and reported during the **policy period**. It is therefore important for **you** to be certain that there are no gaps in **your** insurance coverage. These gaps can occur in several ways. Among the most common are:

1.  If **you** switch from an **occurrence policy** to a **claims-made policy**, the **retroactive date** in **your claims-made policy** should be no later than the expiration date of the **occurrence policy**.

2.  When replacing a **claims-made policy** with a **claims-made policy**, **you** should consider the following:

    a.  The **retroactive date** in the replacement policy should extend far enough back in time to cover any events with long periods of liability exposure, or

    b.  If the **retroactive date** in the replacement policy does not extend far enough back in time to cover events with long periods of liability exposure, **you** should consider purchasing **extended reporting period** coverage under the old **claims-made policy**.

3.  If **you** replace this **claims-made policy** with an **occurrence policy**, **you** may not have insurance coverage for a **claim** arising during the period of **claims-made** unless **you** have purchased an **extended reporting period** under the **claims-made policy**. **Extended reporting period** coverage must be offered to **you** by law for at least one year after the expiration of the **claims-made policy** at a premium not to exceed 200% of **your** last policy premium.

**CAREFULLY REVIEW YOUR POLICY REGARDING THE AVAILABLE EXTENDED REPORTING PERIOD COVERAGE, INCLUDING THE LENGTH OF COVERAGE, THE PRICE AND THE TIME PERIOD DURING WHICH YOU MUST PURCHASE OR ACCEPT ANY OFFER FOR EXTENDED REPORTING PERIOD COVERAGE.**



**Producer Compensation Notice**

You can review and obtain information on The Hartford's
producer compensation practices at www.thehartford.com
or at 1-800-592-5717.